## PLUMLEY v. MASSACHUSETTS.

ERROR TO THE SUPREME JUDICIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS.

No. 406. Argued April 5, 6, 1894. — Decided December 10, 1894.

The act of August 2, 1886, c. 840, 24 Stat. 209, does not give authority to those who pay the taxes prescribed by it, to engage in the manufacture or sale of oleomargarine in any State which lawfully forbids such manufacture or sale, or to disregard any regulations which a State may lawfully prescribe in reference to that article; and that act was not intended to be, and is not, a regulation of commerce among the States.

The statute of Massachusetts of March 10, 1891, c. 58, " to prevent deception in the manufacture and sale of imitation butter," in its application to the sales of oleomargarine artificially colored so as to cause it to look like yellow butter and brought into Massachusetts, is not in conflict with

the clause of the Constitution of the United States investing Congress with power to regulate commerce among the several States.

*Leisy* v. *Hardin*, 135 U. S. 100, 124, is restrained in its application to the case there actually presented for determination, and held not to justify the broad contention that a State is powerless to prevent the sale of articles of food manufactured in or brought from another State, and subjects of traffic or commerce, if their sale may cheat the people into purchasing something they do not intend to buy, and which is wholly different from what its condition and appearance import.

The judiciary of the United States should not strike down a legislative enactment of a State, especially if it has direct connection with the social order, the health and the morals of its people, unless such legislation plainly and palpably violates some right granted or secured by the National Constitution, or encroaches upon the authority delegated to the United States for the attainment of objects of national concern.

THE case is stated in the opinion.

*Mr. Robert M. Morse,* (with whom were *Mr. Albert H. Veeder* and *Mr. William J. Campbell* on the brief,) for plaintiff in error.

*Mr. Albert E. Pillsbury* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

Plumley, the plaintiff in error, was convicted in the Municipal Court of Boston upon the charge of having sold in that city on the 6th day of October, 1891, in violation of the law of Massachusetts, a certain article, product and compound known as oleomargarine, made partly of fats, oils and oleaginous substances and compounds thereof, not produced from unadulterated milk or cream but manufactured in imitation of yellow butter produced from pure unadulterated milk and cream.

The prosecution was based upon a statute of that Commonwealth approved March 10, 1891, Mass. Stats. 1891, c. 58, p. 695, entitled "An act to prevent deception in the manufacture and sale of imitation butter." By that statute it is provided as follows:

"SECTION 1. No person by himself or his agents or servants, shall render or manufacture, sell, offer for sale, expose for sale or have in his possession with intent to sell, any article, product or compound made wholly or partly out of any

fat, oil or oleaginous substance or compound thereof, not produced from unadulterated milk or cream from the same, which shall be in imitation of yellow butter produced from pure unadulterated milk or cream of the same : *provided*, That nothing in this act shall be construed to prohibit the manufacture or sale of oleomargarine in a separate and distinct form, and in such manner as will advise the consumer of its real character, free from coloration or ingredient that causes it to look like butter.

" SECTION 2. Whoever violates any of the provisions of section one of this act shall be punished by a fine of not less than one hundred nor more than five hundred dollars, or by imprisonment in the house of correction for a term not exceeding one year.

" SECTION 3. Inspectors of milk shall institute complaints for the violation of the provisions of this act when they have reasonable cause to believe that any of its provisions have been violated ; and on the information of any person who lays before them satisfactory evidence by which to sustain such complaint, said inspectors may enter all places where butter or imitations thereof are stored or kept for sale, and shall also take specimens of suspected butter and imitations thereof and cause them to be analyzed or otherwise satisfactorily tested, the result of which analysis or test they shall record and preserve as evidence ; and a certificate of such result sworn to by the analyzer, shall be admitted in evidence in all prosecutions under this act. The expense of such analysis or test, not exceeding twenty dollars in any one case, may be included in the costs of such prosecutions. Whoever hinders, obstructs, or in any way interferes with any inspector in the performance of his duty shall be punished by a fine of fifty dollars for the first offence, and one hundred dollars for each subsequent offence.

" SECTION 4. This act shall not be construed to impair or prevent the prosecution and punishment of any violation of laws existing at the time of its passage and committed prior to its taking effect."

The defendant was found guilty of the offence charged.

The court adjudged that he pay a fine of one hundred dollars and on default thereof stand committed in the common jail of Suffolk County until the fine was paid. Such default having occurred, a writ of commitment was issued under which he was taken for the purpose of imprisoning him in jail until the fine was paid.

He sued out a writ of *habeas corpus* from the Supreme Judicial Court of Massachusetts upon the ground that he was restrained of his liberty in violation of the Constitution and laws of the United States.

In his petition for the writ the accused set forth, in substance, that at the time and place charged he offered for sale and sold one package containing ten pounds of oleomargarine, manufactured from pure animal fats or substances and designed to take the place of butter produced from pure, unadulterated milk or cream. He also alleged that the oleomargarine in question was manufactured by a firm of which he was an agent, and the members of which were citizens and residents of Illinois engaged at the city of Chicago in the business of manufacturing that article and shipping it to various cities, towns, and places in Illinois and in other States and there selling the same; and that all oleomargarine manufactured by that firm and by other leading manufacturers was a wholesome, nutritious, palatable article of food, in no way deleterious to the public health or welfare.

The petitioner claimed that the statute of Massachusetts was repugnant to the clause of the Constitution providing that the Congress shall have power to regulate commerce among the several States; to the clause declaring that the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States; to the clause providing that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws; to the clause declaring that private property shall not be taken for public purposes; and to the act of Congress of August 2, 1886,

c. 840, entitled " An act defining butter, also imposing a tax upon and regulating the manufacture, sale, importation, and exportation of oleomargarine." 24 Stat. 209 ; Rev. Stat. Suppl. 2d ed. 505.

The case was heard before one of the Justices of that court and was reported to the full court on the petition and on the following facts and offer of proof:

" The proceedings are as alleged in the petition. The article sold by the petitioner was the article the sale of which is forbidden by chapter 58 of the acts of 1891. Oleomargarine has naturally a light-yellowish color, but the article sold by the petitioner was artificially colored in imitation of yellow butter.

" The allegations concerning the quality or wholesome character of the article sold are not admitted. The petitioner offers to prove the allegations of the petition in respect to the character and qualities of the article, and the Commonwealth objects to such proofs as immaterial, and the petitioner is to have the benefit of his offer if found material.

" It is admitted that the article sold was sent by the manu-. facturers thereof in the State of Illinois to the petitioner, their agent in Massachusetts, and was sold by him in the original package, and that in respect to the article sold the importers and the petitioners had complied with all the requirements of the act of Congress regulating the sale of oleomargarine, and it was marked and distinguished by all the marks, words, and stamps required of oleomargarine by the laws of this Commonwealth."

It was adjudged that the prisoner be remanded to the custody of the keeper of the common jail to be therein confined, the opinion of that court being that the statute of Massachusetts was not in violation of the Constitution or laws of the United States; and, consequently, that the petitioner was not illegally restrained of his liberty. 156 Mass. 236. The present writ of error brings up that judgment for review.

The learned counsel for the appellant states that Congress in the act of August 2, 1886, has legislated fully on the subject of oleomargarine. This may be true so far as the purposes of that act are concerned. But there is no ground to

suppose that Congress intended in that enactment to interfere with the exercise by the States of any authority they could rightfully exercise over the sale within their respective limits of the article defined as oleomargarine. The statute imposed certain special taxes upon manufactures of oleomargarine, as well as upon wholesale and retail dealers in that compound. And it is expressly declared (§ 3) that sections 3232 to 3241 inclusive and section 3243 of the Revised Statutes, Title Internal Revenue, "are, so far as applicable, made to extend to and include and apply to the special taxes" so imposed, "and to the persons upon whom they are imposed." Section 3243 of the Revised Statutes is in these words: "The payment of any tax imposed by the internal revenue laws for carrying on any trade or business shall not be held to exempt any person from any penalty or punishment provided by the laws of any State for carrying on the same within such State, or in any manner to authorize the commencement or continuance of such trade or business contrary to the laws of such State or in places prohibited by municipal law; nor shall the payment of any such tax be held to prohibit any State from placing a duty or tax on the same trade or business, for State or other purposes." It is manifest that this section was incorporated into the act of August 2, 1886, to make it clear that Congress had no purpose to restrict the power of the States over the subject of the manufacture and sale of oleomargarine within their respective limits. The taxes prescribed by that act were imposed for national purposes, and their imposition did not give authority to those who paid them to engage in the manufacture or sale of oleomargarine in any State which lawfully forbade such manufacture or sale, or to disregard any regulations which a State might lawfully prescribe in reference to that article. *License Tax Cases*, 5 Wall. 462, 474; *Pervear* v. *Commonwealth*, 5 Wall. 475; *United States* v. *Dewitt*, 9 Wall. 41.

Nor was the act of Congress relating to oleomargarine intended as a regulation of commerce among the States. Its provisions do not have special application to the transfer of oleomargarine from one State of the Union to another. They

relieve the manufacturer or seller, if he conforms to the regulations prescribed by Congress or by the Commissioner of Internal Revenue under the authority conferred upon him in that regard, from penalty or punishment so far as the general government is concerned, but they do not interfere with the exercise by the States of any authority they possess of preventing deception or fraud in the sales of property within their respective limits.

The vital question in this case is, therefore, unaffected by the act of Congress or by any regulations that have been established in execution of its provisions. That question is, whether, as contended by the petitioner, the statute under examination in its application to sales of oleomargarine brought into Massachusetts from other States is in conflict with the clause of the Constitution of the United States investing Congress with power to regulate commerce among the several States. This is the only question the learned counsel for the petitioner urges upon our attention, and, in view of the decision in *Powell* v. *Pennsylvania*, 127 U. S. 678, is the only one that we need consider.

It will be observed that the statute of Massachusetts which is alleged to be repugnant to the commerce clause of the Constitution does not prohibit the manufacture or sale of all oleomargarine, but only such as is colored in imitation of yellow butter produced from pure unadulterated milk or cream of such milk. If free from coloration or ingredient that "causes it to look like butter," the right to sell it "in a separate and distinct form, and in such manner as will advise the consumer of its real character," is neither restricted nor prohibited. It appears, in this case, that oleomargarine, in its natural condition, is of "a light-yellowish color," and that the article sold by the accused was artificially colored "in imitation of yellow butter." Now, the real object of coloring oleomargarine so as to make it look like genuine butter is that it may appear to be what it is not, and thus induce unwary purchasers, who do not closely scrutinize the label upon the package in which it is contained, to buy it as and for butter produced from unadulterated milk or cream from such milk. The suggestion

that oleomargarine is artificially colored so as to render it more palatable and attractive can only mean that customers are deluded, by such coloration, into believing that they are getting genuine butter. If any one thinks that oleomargarine, not artificially colored so as to cause it to look like butter, is as palatable or as wholesome for purposes of food as pure butter, he is, as already observed, at liberty under the statute of Massachusetts to manufacture it in that State or to sell it there in such manner as to inform the customer of its real character. He is only forbidden to practise, in such matters, a fraud upon the general public. The statute seeks to suppress false pretences and to promote fair dealing in the sale of an article of food. It compels the sale of oleomargarine for what it really is, by preventing its sale for what it is not. Can it be that the Constitution of the United States secures to any one the privilege of manufacturing and selling an article of food in such manner as to induce the mass of people to believe that they are buying something which, in fact, is wholly different from that which is offered for sale? Does the freedom of commerce among the States demand a recognition of the right to practice a deception upon the public in the sale of any articles, even those that may have become the subject of trade in different parts of the country?

Several cases in this court were cited in argument to support the contention that the grant of power to Congress to regulate interstate commerce extended to such legislation as that enacted by the Commonwealth of Massachusetts. Let us see whether those cases announce any principle that compels this court to adjudge that the States have surrendered to the general government the power to prevent fraud in the sales of property.

*Railroad Co.* v. *Husen,* 95 U. S. 465, 473, involved the validity of a statute of Missouri which was so framed as to prevent the bringing into that State of any Texan, Mexican, or Indian cattle, between March 1 and December 1 in any year, whether free from disease or not, or whether their coming into the State would be injurious to its inhabitants or not. If they were brought into Missouri for the purpose of carrying them

through that State without unloading them, such burdens and restrictions were imposed as amounted to an exclusion from its limits of any cattle such as those described in the statute. This court held that the Missouri statute was neither a quarantine nor an inspection law; that its object and effect was to meet at the borders of Missouri a large and common subject of commerce and prohibit its crossing the state line during the larger part of each year, and to obstruct interstate commerce and discriminate between the property of citizens of one State and that of citizens of other States. The statute was, consequently, adjudged to be unconstitutional.

*Minnesota* v. *Barber*, 136 U. S. 313, 322, involved the validity of a statute of Minnesota which, by its necessary operation, excluded from the markets of that State all fresh beef, veal, mutton, lamb, or pork, in whatever form, and although entirely sound, healthy, and fit for human food, taken from animals slaughtered in other States; and which directly tended to restrict the slaughtering of animals, whose meat was to be sold in Minnesota, to those engaged in such business in that State. The court said : "If the object of the statute had been to deny altogether to the citizens of other States the privilege of selling, within the limits of Minnesota, for human food, any fresh beef, veal, mutton, lamb, or pork, from animals slaughtered outside of that State, and to compel the people of Minnesota, wishing to buy such meats, either to purchase those taken from animals inspected and slaughtered in the State, or to incur the cost of purchasing them, when desired for their own domestic use, at points beyond the State, that object is attained by the act in question. Our duty to maintain the Constitution will not permit us to shut our eyes to these obvious and necessary results of the Minnesota statute. If this legislation does not make such discrimination against the products and business of other States in favor of the products and business of Minnesota as interferes with and burdens commerce among the several States, it would be difficult to enact legislation that would have that result."

*Brimmer* v. *Rebman*, 138 U. S. 78, 82, involved the validity

of a statute of Virginia relating to the sale, in that Common-wealth, of unwholesome meat. The statute was held to be unconstitutional as prohibiting, by its necessary operation, the sale in Virginia of beef, veal, or mutton, although entirely wholesome, if from animals slaughtered one hundred miles or over from the place of sale. The court said: "Undoubtedly, a State may establish regulations for the protection of its people against the sale of unwholesome meats, provided such regulations do not conflict with the powers conferred by the Constitution upon Congress, or infringe rights granted or secured by that instrument. But it may not, under the guise of exerting its police powers, or of enacting inspection laws, make discriminations against the products and industries of some of the States in favor of the products and industries of its own or of other States. The owner of the meats here in question, although they were from animals slaughtered in Illinois, had the right, under the Constitution, to compete in the markets of Virginia upon terms of equality with the owners of like meats from animals slaughtered in Virginia or elsewhere within one hundred miles from the place of sale. Any local regulation which, in terms or by its necessary oper-ation, denies this equality in the markets of the State is, when applied to the people and products or industries of other States, a direct burden upon commerce among the States, and, therefore, void." This case was followed in *Voight* v. *Wright*, 141 U. S. 62, 66, where this court held a statute of Virginia, relating to the inspection of flour brought into that Commonwealth, to be unconstitutional, because it required the inspection of flour from other States, when no such in-spection was required of flour manufactured in Virginia.

So in *Walling* v. *Michigan*, 116 U. S. 446, 459, which in-volved the validity of a statute of Michigan imposing a tax upon persons not residing or having their principal place of business within the State, but engaged there in the business of selling or soliciting the sale of intoxicating liquors to be shipped into the State from places without it, but not impos-ing a similar tax upon persons selling or soliciting the sale of intoxicating liquors manufactured in that State. The statute

was held to be in restraint of interstate commerce, and therefore void. It having been suggested that the tax imposed was an exercise of the police power of the State for the discouragement of the use of intoxicating liquors, and the preservation of the health and morals of the people, this court said : "This would be a perfect justification of the act if it did not discriminate against the citizens and products of other States in a matter of commerce among the States, and thus usurp one of the prerogatives of the national legislature."

It is obvious that none of the above cases presented the question now before us. Each of them involved the question whether one State could burden interstate commerce by means of discriminations enforced for the benefit of its own products and industries at the expense of the products and industries of other States. It did not become material in any of them to inquire, nor did this court inquire, whether a State, in the exercise of its police powers, may protect the public against the deception and fraud that would be involved in the sale within its limits for purposes of food of a compound that had been so prepared as to make it appear to be what it was not. While in each of those cases it was held that the reserved police powers of the States could not control the prohibitions of the Federal Constitution nor the powers of the government it created, (*New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650,) it was distinctly stated that the grant to Congress of authority to regulate foreign and interstate commerce did not involve a surrender by the States of their police powers. If the statute of Massachusetts had been so framed as to be applicable only to oleomargarine manufactured in other States, and which had been made in imitation of pure butter, the case would have been wholly different. But we have seen that it is not of that character, but is aimed at all oleomargarine artificially colored so as to *cause* it to look like genuine butter and offered for sale in Massachusetts.

In none of the above cases is there to be found a suggestion or intimation that the Constitution of the United States took from the States the power of preventing deception and fraud

in the sale, within their respective limits, of articles in whatever State manufactured, or that that instrument secured to any one the privilege of committing a wrong against society.

Referring to the general body of the law, from whatever source derived, existing in each State of the Union and regulating the rights and duties of all within its jurisdiction, even those engaged in interstate commerce, this court, speaking by Mr. Justice Matthews, said in *Smith* v. *Alabama*, 124 U. S. 465, 476, that "it was in contemplation of the continued existence of this separate system of law in each State that the Constitution of the United States was framed and ordained with such legislative powers as are therein granted expressly or by reasonable implication." It was, consequently, held in that case that a State may enact laws and prescribe regulations, applicable to carriers engaged in interstate and foreign commerce, to insure the safety of persons carried by them as well as the safety of persons and things liable to be affected by their acts while they were within the territorial jurisdiction of the State. So, in *Dent* v. *West Virginia*, 129 U. S. 114, 122, which involved the validity of a state enactment making it a public offence for any one to practise medicine in West Virginia without complying with certain prescribed conditions, this court, speaking by Mr. Justice Field, said: "The power of the State to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity as well as deception and fraud."

If there be any subject over which it would seem the States ought to have plenary control, and the power to legislate in respect to which it ought not to be supposed was intended to be surrendered to the general government, it is the protection of the people against fraud and deception in the sale of food products. Such legislation may, indeed, indirectly or incidentally affect trade in such products transported from one State to another State. But that circumstance does not show that laws of the character alluded to are inconsistent with the power of Congress to regulate commerce among the States.

For, as said by this court in *Sherlock* v. *Alling*, 93 U. S. 99, 103 : "In conferring upon Congress the regulation of commerce, it was never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it within the meaning of the Constitution. . . . And it may be said generally, that the legislation of a State, not directed against commerce or any of its regulations, but relating to the rights, duties, and liabilities of citizens, and only directly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit."

But the case most relied on by the petitioner to support the proposition that oleomargarine, being a recognized article of commerce, may be introduced into a State and there sold in original packages, without any restriction being imposed by the State upon such sale, is *Leisy* v. *Hardin*, 135 U. S. 100.

The majority of the court in that case held that ardent spirits, distilled liquors, ale and beer, were subjects of exchange, barter, and traffic, and, being articles of commerce, their sale while in the original packages in which they are carried from one State to another State, could not without the assent of Congress be forbidden by the latter State ; that the parties in that case, who took beer from Illinois into Iowa, had the right, under the Constitution of the United States, to sell it in Iowa in such original packages, any statute of that State to the contrary notwithstanding ; and that Iowa had no control over such beer until the original packages were broken and the beer in them became mingled in the common mass of property within its limits. "Up to that point of time," the court said, "we hold that in the absence of Congressional permission to do so, the State had no power to interfere by seizure, or any other action in prohibition of

importation and sale by the foreign or non-resident importer." p. 124.

It is sufficient to say of *Leisy* v. *Hardin* that it did not in form or in substance present the particular question now under consideration. The article which the majority of the court in that case held could be sold in Iowa in original packages, the statute of that State to the contrary notwithstanding, was beer manufactured in Illinois and shipped to the former State to be there sold in such packages. So far as the record disclosed, and so far as the contentions of the parties were concerned, the article there in question was what it appeared to be, namely, genuine beer, and not a liquid or drink colored artificially so as to cause it to look like beer. The language we have quoted from *Leisy* v. *Hardin* must be restrained in its application to the case actually presented for determination, and does not justify the broad contention that a State is powerless to prevent the sale of articles manufactured in or brought from another State, and subjects of traffic and commerce, if their sale may cheat the people into purchasing something they do not intend to buy and which is wholly different from what its condition and appearance import. At the term succeeding the decision in *Leisy* v. *Hardin*, this court in *Rahrer's Case*, 140 U. S. 545, 546, sustained the validity of the act of Congress of August 8, 1890, c. 728, 26 Stat. 313, known as the Wilson act, and in the light of the decision in *Leisy* v. *Hardin*, said, by the Chief Justice, that "the power of the State to impose restraints and burdens upon persons and property in conservation and promotion of the public health, good order, and prosperity, is a power originally and always belonging to the States, not surrendered by them to the general government nor directly restrained by the Constitution of the United States, and essentially exclusive," and that "it is not to be doubted that the power to make the ordinary regulations of police remains with the individual States, and cannot be assumed by the national government."

The judgment of the court below is supported by many well-considered cases.

In *People* v. *Arenburg*, 105 N. Y. 123, 129, 130, the precise question now before us came before the Court of Appeals of New York. That court, after referring to its decision in *People* v. *Marx*, 99 N. Y. 377, 385, adjudging a statute of New York relating to the manufacture of oleomargarine to be in violation of the fundamental right and privilege of every American citizen to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit, said: " Assuming, as is claimed, that butter made from animal fat or oil is as wholesome, nutritious, and suitable for food as dairy butter; that it is composed of the same elements and is substantially the same article, except as regards its origin, and that it is cheaper, and that it would be a violation of the constitutional rights and liberties of the people to prohibit them from manufacturing or dealing in it, for the mere purpose of protecting the producers of dairy butter against competition, yet it cannot be claimed that the producers of butter, made from animal fat, or oils, have any constitutional right to resort to devices for the purpose of making their product resemble in appearance the more expensive article known as dairy butter, or that it is beyond the power of the legislature to enact such laws as they may deem necessary to prevent the simulated article being put upon the market in such a form and manner as to be calculated to deceive." " If it possesses," continued the court, " the merits which are claimed for it, and is innocuous, those making and dealing in it should be protected in the enjoyment of liberty in those respects, but they may legally be required to sell it for and as what it actually is and upon its own merits, and are not entitled to the benefit of any additional market value which may be imparted to it by resorting to artificial means to make it resemble dairy butter in appearance. It may be butter, but it is not butter made from cream, and the difference in cost or market value, if no other, would make it a fraud to pass off one article for the other." Again: " The statutory prohibition is aimed at a designed and intentional imitation of dairy butter, in manufacturing the new product, and not at a resemblance in qualities inherent in the articles themselves

and common to both." The court, therefore, held that arti-ficial coloring of oleomargarine for the mere purpose of making it resemble dairy butter came within the statutory prohibition against' imitation, and "that such prohibition is within the power of the legislature, and rests upon the same principle which would sustain a prohibition of' coloring winter dairy butter for the purpose of enhancing its market price by making it resemble summer dairy butter, should the legislature deem such a prohibition necessary or expedient."

In *McAllister* v. *State*, 72 Maryland, 390, the Court of Appeals of Maryland sustained the validity of a statute of that State declaring it unlawful to offer for sale as an article of food an article in imitation and semblance of natural butter. The object of the statute being to protect purchasers against fraud and deception, the power of the legislature, the court said, following the previous decision in *Pierce* v. *State*, 63 Maryland, 596, was too plain to be questioned.

In *Waterbury* v. *Newton*, 21 Vroom, (50 N. J. Law,) 534, 537, the New Jersey Supreme Court sustained the validity of an act that forbade the sale of oleomargarine colored with annotto. In response to the suggestion that oleomargarine colored with annotto was a wholesome article of food, the sale of which could not be prohibited, the court said : "If the sole basis for this statute were the protection of the public health, this objection would be pertinent, and might require us to consider the delicate questions, whether and how far the judiciary can pass upon the adaptability of the means which the legislature has proposed for the accomplishment of its legitimate ends. But, as already intimated, this provision is not aimed at the protection of the public health. Its object is to secure to dairymen and to the public at large a fuller and fairer enjoyment of their property, by excluding from the market a commodity prepared with a view to deceive those purchasing it. It is not pretended that annotto has any other function in the manufacture of oleomargarine than to make it a counterfeit of butter, which is more generally esteemed, and commands a higher price. That the legislature may repress such counterfeits does not admit, I think, of substantial ques-

tion. Laws of like character have of late years been frequently assailed before the courts, but always without success." It was further held. by the court that the statute of New Jersey was not repugnant to the clause of the Constitution empowering Congress to regulate commerce among the States, but that the package there in question, and which had been brought from Indiana, became, on its delivery in Jersey City, subject to the laws of New Jersey relating generally to articles of that nature.

So in *State* v. *Marshall,* 64 N. H. 549, 551, 552, arising under a statute of New Hampshire relating to the sale of imitation butter, the court said: "Butter is a necessary article of food, of almost universal consumption; and if an article compounded from cheaper ingredients, which many people would not purchase or use if they knew what it was, can be made so closely to resemble butter that ordinary persons cannot distinguish it from genuine butter, the liability to deception is such that the protection of the public requires those dealing in the article in some way to designate its real character. . . . The prohibition of the statute being directed against imposition in selling or exposing for sale artificial compounds resembling butter in appearance and flavor, and liable to be mistaken for genuine butter, it is no defence that the article sold or exposed for sale is free from impurity and unwholesome ingredients, and healthy and nutritious as an article of food."

In *State* v. *Addington,* 77 Missouri, 110, 118, the court, referring to a statute prohibiting the manufacture and sale of oleaginous substances, or compounds of the same, in imitation of dairy products, said: " The central idea of the statute before us seems very manifest; it was, in our opinion, the prevention of facilities for selling or manufacturing a spurious article of butter, resembling the genuine article so closely in its external appearance as to render it easy to deceive purchasers into buying that which they would not buy but for the deception. The history of legislation on this subject, as well as the phraseology of the act itself, very strongly tends to confirm this view. If this was the purpose of the enact-

ment now under discussion, we discover nothing in its pro-
visions which enables us, in the light of the authorities, to say
that the legislature, when passing the act, exceeded the power
confided to that department of the government; and unless
we can say this, we cannot hold the act to be anything less
than valid."

To the same effect are *Powell* v. *Commonwealth*, 114 Penn.
St. 265; *Butler* v. *Chambers*, 36 Minnesota, 69; and *Weideman*
v. *State*, 56 N. W. Rep. (Minnesota) 688.

In *Railroad Co.* v. *Husen*, above cited, the court, speaking
generally, said that the police power of a State extended to
the making of regulations "promotive of domestic order,
morals, health, and safety." It was there held, among other
things, to be "within the range of legislative action to define
the mode and manner in which every one may so use his own
as not to injure others," and that "the police powers of a State
justified the adoption of precautionary measures against social
evils," and the enactment of such laws as would have "im-
mediate connection with the protection of persons and prop-
erty against the noxious acts of others."

It has therefore been adjudged that the States may legislate
to prevent the spread of crime, and may exclude from their
limits paupers, convicts, persons likely to become a public
charge, and persons afflicted with contagious or infectious
diseases. These and other like things having immediate con-
nection with the health, morals, and safety of the people, may
be done by the States in the exercise of the right of self-
defence. And yet it is supposed that the owners of a com-
pound which has been put in a condition to cheat the public
into believing that it is a particular article of food in daily
use and eagerly sought by people in every condition of life,
are protected by the Constitution in making a sale of it against
the will of the State in which it is offered for sale, because of
the circumstance that it is an original package, and has become
a subject of ordinary traffic. We are unwilling to accept this
view. We are of opinion that it is within the power of a
State to exclude from its markets any compound manufactured
in another State, which has been artificially colored or adul-

terated so as to cause it to look like an article of food in general use, and the sale of which may, by reason of such coloration or adulteration, cheat the general public into purchasing that which they may not intend to buy. The Constitution of the United States does not secure to any one the privilege of defrauding the public. The deception against which the statute of Massachusetts is aimed is an offence against society; and the States are as competent to protect their people against such offences or wrongs as they are to protect them against crimes or wrongs of more serious character. And this protection may be given without violating any right secured by the national Constitution, and without infringing the authority of the general government. A State enactment forbidding the sale of deceitful imitations of articles of food in general use among the people does not abridge any privilege secured to citizens of the United States, nor, in any just sense, interfere with the freedom of commerce among the several States. It is legislation which "can be most advantageously exercised by the States themselves." *Gibbons* v. *Ogden*, 9 Wheat. 1, 203.

We are not unmindful of the fact — indeed, this court has often had occasion to observe — that the acknowledged power of the States to protect the morals, the health, and safety of their people by appropriate legislation, sometimes touches, in its exercise, the line separating the respective domains of national and state authority. But in view of the complex system of government which exists in this country, "presenting," as this court, speaking by Chief Justice Marshall, has said, "the rare and difficult scheme of one general government, whose action extends over the whole, but which possesses only certain enumerated powers, and of numerous state governments, which retain and exercise all powers not delegated to the Union," the judiciary of the United States should not strike down a legislative enactment of a State — especially if it has direct connection with the social order, the health, and the morals of its people — unless such legislation plainly and palpably violates some right granted or secured by the national Constitution or encroaches upon the authority dele-

gated to the United States for the attainment of objects of national concern.

We cannot so adjudge in reference to the statute of Massachusetts, and as the court below correctly held that the plaintiff in error was not restrained of his liberty in violation of the Constitution of the United States, the judgment must be affirmed.

MR. JUSTICE JACKSON, now absent, was present at the argument and participated in the decision of this case. He concurs in this opinion.

*Judgment affirmed.*

MR. CHIEF JUSTICE FULLER, with whom concurred MR. JUSTICE FIELD and MR. JUSTICE BREWER, dissenting.

The power vested in Congress to regulate commerce among the several States is the power to prescribe the rule by which that commerce is to be governed, and, as that commerce is national in its character and must be governed by a uniform system, so long as Congress does not pass any law to regulate it, or allowing the States to do so, it thereby indicates its will that such commerce shall be free and untrammelled. Manifestly, whenever state legislation comes in conflict with that will, it must give way.

In whatever language such legislation may be framed, its purpose must be determined by its natural and reasonable effect, and the presumption that it was enacted in good faith cannot control the determination of the question whether it is or is not repugnant to the Constitution of the United States.

Upon this record oleomargarine is conceded to be a wholesome, palatable, and nutritious article of food, in no way deleterious to the public health or welfare. It is of the natural color of butter and looks like butter, and is often colored, as butter is, by harmless ingredients, a deeper yellow, to render it more attractive to consumers. The assumption that it is thus colored to make it appear to be a different article, generically, than it is, has no legal basis in this case to rest on. It cannot be denied that oleomargarine is a recognized

article of commerce, and moreover, it is regulated as such, for revenue purposes, by the act of Congress of August 2, 1886, c. 840, 24 Stat. 209; *United States* v. *Eaton*, 144 U. S. 677.

The act under consideration prohibits its sale if "in imitation of yellow butter," though it may be sold "in a separate and distinct form, and in such manner as will advise the consumer of its real character, free from coloration or ingredient that causes it to look like butter." This prohibits its sale in its natural state of light yellow, or when colored a deeper yellow, because in either case it looks like butter. The statute is not limited to imitations made for a fraudulent purpose, that is, intentionally made to deceive. The act of Congress requiring, under penalty, oleomargarine to be sold only in designated packages, marked, stamped, and branded as prescribed, and numerous acts of Massachusetts, minutely providing against deception in that respect, (Pub. Stat. Mass. c. 56; Stats. 1884, c. 310; Stats. 1886, c. 317; Stats. 1891, c. 412,) amply protect the public from the danger of being induced to purchase oleomargarine for butter. The natural and reasonable effect of this statute is to prevent the sale of oleomargarine because it looks like butter. How this resemblance, although it might possibly mislead a purchaser, renders it any the less an article of commerce, it is difficult to see.

I deny that a State may exclude from commerce legitimate subjects of commercial dealings because of the possibility that their appearance may deceive purchasers in regard to their qualities.

In the language of Knowlton, J., in the dissenting opinion below, I am not "prepared to hold that no cloth whose fabric is so carded and spun and woven and finished as to give it the appearance of being wholly wool, when in fact it is in part cotton, can be a subject of commercial transactions, or that no jewelry which is not gold, but is made to resemble gold, and no imitations of precious stones, however desirable they may be considered by those who wish to wear them, shall be deemed articles of merchandise in regard to which Congress may make commercial regulations."

Other illustrations will readily suggest themselves. The concession involves a serious circumscription of the realm of trade and destroys the rule by an unnecessary exception.

The right to import, export, or sell oleomargarine in the original package under the regulations prescribed by Congress cannot be inhibited by such legislation as that before us. Fluctuation in decision in respect of so vital a power as that to regulate commerce among the several States, is to be deprecated, and the opinion and judgment in this case seem to me clearly inconsistent with settled principles. I dissent from the opinion and judgment, and am authorized to say that MR. JUSTICE FIELD and MR. JUSTICE BREWER concur with me in so doing.