# Court of Appeals.

February 26, 1895.

## PEOPLE v. ANTHONY GIRARD.

(64 St. Rep. 554; 145 N. Y. 105.)

FOOD—ADULTERATION.

> The adding of a foreign and artificial ingredient to a food product, even for the purpose of color merely, is in effect, an adulteration, and the legislature has power to prohibit such act.

Appeal from judgment of the general term of the supreme court in the fourth judicial department, entered upon an order, which affirmed a judgment in favor of plaintiff entered upon a verdict directed by the court.

F. G. Fincke, for appellant.

C. D. Adams, for respondent.

FINCH, J.—The argument in this case concedes the undoubted rule that the police power of the state may be exerted

to protect the public health or prevent a fraud upon the people, but that the law professing to intend that result must indicate by its terms that such was its real and actual purpose, and exhibit a capacity to operate in the asserted direction.   The defendant sold vinegar containing artificial coloring matter in violation of the law of 1889 (Chap. 515, § 4),which provides that "no person shall manufacture, produce, sell or keep for sale, or offer for sale, any vinegar which shall contain any preparation of lead, copper, sulphuric acid, or other ingredients injurious to health, or any artificial coloring matter." It is evident that the last clause has relation to the prevention of fraud, not only because of the form and mode of expression, but also because, if limited to an effect upon the public health, it would become a mere useless repetition.   Any ingredients so injurious had already been prohibited, and the further limitation must be assumed to have a further purpose and relate to the prevention of fraud in the production and sale of vinegar.   It must be also assumed that the legislature acted with knowledge of this particular food product, of its appearance, and the modes of its manufacture.    Everybody is familiar with cider vinegar, for it goes into all households.   Its color and appearance are as well understood as its taste.   But another vinegar has come upon the market made by a distillation from grain.   Its natural upon the market made by a distillation from grain.   It is said to be entirely healthy and safe as a food product, and that may be granted.   No law forbids its manufacture and sale.    The markets of the state are open to it freely, and without restraint, and the only prohibition is against the fraud of a false color.    Its natural color, when honestly made, is much lighter than that of cider vinegar, and gives it rather a resemblance to water with some faint trace of color, or to a white wine.    Purchasers had a natural preference for the old familiar article and were more or less averse to an experiment with the new.   They could tell the difference at a glance by the marked difference in color. The new product probably made its way slowly for that reason, and the greed of profit which has adulterated or disguised almost every article of food, led to the device of coloring it so as to change its appearance from almost white to a brown or

amber color, which is that of the ordinary cider vinegar. Thus changed ,the new product might easily deceive purchasers. They would accept it supposing it to be cider vinegar when, if its natural color had remained, they would have refused it. Obviously, the artificial coloring matter is used for some purpose. It adds to the cost and labor of preparation, and such expense would not be incurred unless it improved the salable quality of the article. The coloring matter does not affect the taste or actual quality of the vinegar when, as here, it is burnt sugar or carmel which is used, but it does change the appearance. It masks the truth; it effects a disguise; it naturally deceives and is intended to deceive; for the new color is that of cider vinegar and enables the substituted product to be foisted upon those who prefer and seek the old. We can see how it operated in the case before us. The defendants were Italians. They say they knew nothing about cider vinegar and that such an article is not found in Italy. They were good subjects for the manufacturer to use. They bought a barrel of vinegar and got the distilled product having an artificial amber color. A purchaser comes and asks for cider vinegar. The sellers give him the new, claiming that vinegar is vinegar, and very possibly, not appreciating the word cider as a qualification. But whether they were the mere tools of the manufacturer or themselves cognizant of the situation, it is apparent that the vinegar was colored for the purpose of deception and to defraud the buyer. The legislature had a right to forbid that device and put a stop to the fraud, but how were they to do so? They, might forbid specially the use of a coloring matter creating a resemblance to cider vinegar, or accomplish the same purpose by forbidding the use of any coloring whatever. By the first process they would remit the question of imitation to a jury; by the second they would decide it themselves conclusively and once for all. So far as the present facts are concerned, either form of prohibition effects one and the same precise result, for there is no proof that distilled vinegar is ever colored or even likely to be colored in any other way than so as to resemble cider vinegar; and the form of law, judged by the situation it was framed to meet, is identical in its results in either case. But beyond that, the legislature might make the prohibition abso-

lute for two reasons: One, the difficulty of enforcing a special provision limited narrowly to an imitation with intent to deceive, in which event there would always be a question of fact more or less hampering the effective execution of the law; and the other, that any tampering with food products which adds ingredients not natural or essential is fraught with danger to the public health, or, at least, involves the intent and result of a fraud upon the community. Food should be pure, absolutely and unquestionably pure. No tricks should be played with it. The legislature may resolutely protect it. No artificial color can ever be added to distilled vinegar for any good or honest purpose that I can imagine. Counsel say it might be colored blue or green so that no purchaser would take it for cider vinegar, and yet the law is broad enough to forbid that. I grant it. The case is imaginary, but assume it to be real. The blue or green color would, at least, disguise the actual product, and permission to color at all opens the door to coloring matters which might well be dangerous to health. Must the legislature wait for the experiment and until some number of people are made sick or die of it? In so serious a matter as the absolute purity of food we ought not to say that a general law, which simply compels that absolute purity, is beyond the power of the legislature.

There is talk here of interference with the vested rights of the individual. Sometimes it is pertinent and weighty, but in this case it is neither. It becomes the assertion of a vested right to color a food product so as to conceal or disguise its true or natural appearance; in plain words, a vested right to deceive the public.

This is by no means the first time that the legislature has acted by a general law in seeking to protect the public health and safety. It has provided a fixed standard for the purity of milk, judging for itself, absolutely and conclusively, what that standard should be, instead of leaving it to the varying judgment of different juries. We sustained that law in the case of Cipperly, adopting as our own the dissenting opinion of Judge Learned at the general term, 37 Hun, 319; 101 N. Y. 634. There it was claimed that the law was too broad and inflexible; that instead of merely forbidding the sale of impure or unhealthy

milk, it prohibited the sale of all below an arbitrary standard of purity; and so, that milk which was perfectly pure and healthy might fall within the prohibition because below the standard. We sustained, nevertheless, the constitutionality of the act and the right of the legislature to judge for itself of the danger and the remedy. The right of the legislature to that effect was well illustrated in Commonwealth v. Alger, 7 Cushing, 96, where the case of a powder mill or slaughter house endangered the safety or health of the people was used as an illustration. The legislature is not bound merely to enact that such a structure shall not be put so near a city or village as to endanger the citizens, but may judge for itself and decide what is that distance and not leave it for a jury to say. A municipal corporation may in like manner fix authoritatively and by a general ordinance the rate of speed of railroad trains through its streets. These cases are referred to only as showing the right of the legislature to judge for itself of the character and extent of the danger which is shown to exist, and to apply the remedy by a definite rule of prohibition. Every general law may work harshly in a few particular instances. If that were true in the present case it would not determine the constitutional question. Adding a foreign and artificial ingredient to a food product, even for purposes of color merely, is, in effect, an adulteration, and whether it be so described or forbidden by more specific terms is not material. The present law does not in the least interfere with the honest manufacture and sale of the distilled vinegar. It simply provides that it shall not be falsely colored. I think the legislature did not in this case, and under the circumstances existing, exceed its power.

The judgment should be affirmed.

All concur, except BARTLETT and HAIGHT, JJ., dissenting, the latter on the construction of the statute.

Judgment affirmed.