(75 App. Div. 11.)

### PEOPLE v. NIAGARA FRUIT CO. et al.

(Supreme Court, Appellate Division, Fourth Department. July 8, 1902.)

1. CIDER VINEGAR—ADULTERATION—PENALTY.

Defendants manufactured and sold as cider vinegar a product extracted from cores, skins, and small pieces of apples, all of which had been evaporated and soaked in river water; coloring matter being added to give it the appearance of cider vinegar. Laws 1893, c. 338, § 50, as amended by Laws 1901, c. 308, provides that vinegar which contains any artificial coloring matter shall be deemed adulterated. Section 51 provides that no person shall manufacture, keep for sale, or offer for sale any adulterated vinegar, or any vinegar or product in imitation of cider vinegar which is not cider vinegar. Section 52 prohibits the marking any package as cider vinegar which is not cider vinegar. Section 53 prescribes a penalty for each violation of such provisions. *Held*, that such product was not cider vinegar, but a simulated and adulterated product, manufactured, marked, and sold as cider vinegar.

2. SAME—CONSTITUTIONAL LAW—INTERSTATE COMMERCE.

The object of Laws 1893, c. 338, §§ 50–53, prohibiting and imposing a penalty for the manufacture, marking, or sale as cider vinegar of any adulterated vinegar, or any product which is not cider vinegar, is to prevent cheating and deception, and for the preservation of health; hence the act is not in conflict with Const. U. S. art. 1, § 8, subd. 3, giving the exclusive right to regulate interstate commerce to congress, though such adulterated or simulated product is sold to citizens of other states.

Appeal from special term, Erie county.

Action by the people against the Niagara Fruit Company and others. From a judgment for plaintiff, defendants appeal. Affirmed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and HISCOCK, JJ.

Hiram R. Wood, for appellants.

Edwin H. Risley, for respondent.

SPRING, J. The appellant fruit company is a domestic corporation, while the appellants Hatch and Hartmann are, respectively, the manager and treasurer thereof. The business of the fruit company is the manufacture and sale of cider vinegar, with its principal office in the city of Rochester, but with a manufacturing plant at Tonawanda, in the county of Erie. This action was commenced to recover penalties for alleged violations of the agricultural laws; charging the defendants with manufacturing and selling vinegar below the state stand-

ard, and simulated cider vinegar for the genuine article, and falsely
labeling its barrels as containing cider vinegar. There were two lots
of vinegar in the possession of the appellants, which were analyzed
and tested under the direction of the state commissioner of agriculture
(one on September 7, 1901, from an 80-barrel lot); and the vinegar
analyzed was taken from 2 barrels, upon one of which had been sten-
ciled in black letters, "New York State Cider Vinegar. Tonawanda,
N. Y. 47 Gallons;" and the other a like marking, except the quantity
was designated as 49 gallons. On the 9th day of September, 1901,
two other inspectors from the department of agriculture took samples
from 6 barrels of this same lot, and which were marked, "Niagara
Fruit Company New York Pure Cider Vinegar Niagara Brand, Tona-
wanda, New York." This lot of vinegar was shipped by the defend-
ants to Bay City, Mich., on the 10th day of September, and it was on
an order received by the appellant fruit company, and the invoice sent
by it designated the shipment as pure cider vinegar. On September
20, 1901, the defendant fruit company had in its possession at Tona-
wanda 80 barrels of vinegar. The inspectors of the state department
took separate samples from 6 barrels of this lot, and these samples,
with the others, were subsequently delivered to him, and analyzed by
a chemical expert employed by the state. This lot of 70 barrels was
shipped to customers in Wisconsin on the 21st day of September to
fill an order, and the invoice sent by the defendant fruit company from
Rochester states this shipment to be 70 barrels of pure cider vinegar,
40 grain; and the freight charge of each shipment was paid by the de-
fendant. The chemical analysis showed that each sample of vinegar
was below the standard fixed by the legislature of the state of New
York, in that it contained less than the required quantity of acetic
acid, and that it was not the exclusive product of pure apple juice, and
that it contained artificial coloring matter, which caused a distinct
change in its appearance.

Section 50 of the agricultural law (chapter 338, Laws 1893, as
amended by chapter 308, Laws 1901) provides that vinegar which con-
tains any "artificial coloring matter or which has not an acidity equiva-
lent to the presence of at least four and one-half centum by weight
of absolute acetic acid, or cider vinegar which has less than such an
amount of acidity    *    *    *    shall be deemed adulterated." The
vinegar referred to did not contain the prescribed acidity; but as that
part of the section was held to be unconstitutional, as creating in a
subsequent clause of the section amended a provision of the statute
discriminating in favor of a class of people, and no recovery was per-
mitted for this adulteration, it is unnecessary to discuss or decide the
questions which might otherwise be important under this section. We
will therefore pass to a consideration of the other sections of the
original statute cited, which it is claimed have been violated by the
appellants. The two succeeding sections are as follows:

"Sec. 51. Manufacture and Sale of Adulterated or Imitation Vinegar Pro-
hibited. No person shall manufacture for sale, keep for sale or offer for
sale: (1) Any adulterated vinegar. (2) Any vinegar or product in imitation
or semblance of cider vinegar, which is not cider vinegar. (3) As or for
cider vinegar, any vinegar or product which is not cider vinegar.

"Sec. 52. Packages Containing Cider Vinegar to be Branded. Every manufacturer or producer of cider vinegar shall plainly brand on the head of each cask, barrel, keg or other package containing such vinegar, his name and place of business and the words 'cider vinegar.' And no person shall mark or brand as or for cider vinegar any package containing that which is not cider vinegar."

Section 53 prescribes a penalty "of $100 for each violation" of the foregoing provisions, to be paid to the people of the state. Cider vinegar is defined in section 50 as "vinegar made exclusively from pure apple juice."

The evidence on the trial showed undisputably that the vinegar sold by the defendant fruit company was extracted from apple cores, skins, and the small pieces of apples, all of which had been evaporated and were soaked in river water, and the vinegar was produced by the fermentation of this product. Coloring matter was added to give it the appearance of cider vinegar. It was therefore a simulated product sold as the genuine article. If this vinegar was sold within the state of New York, clearly it was within the legislative prohibition. The police power has frequently been made the basis of legislation to foster and secure the health of the citizens of the state, and prevent deception upon them. Men, in their cupidity, or from other motives, have often sought to adulterate ordinary food products, and make a spurious article in resemblance of the genuine; and the legislature, in its endeavors to check this untoward tendency, has been upheld by the courts. The following instances of legislative control over the food products in aid of the public health, and which were sustained by the courts, are pertinent: The defining of what constituted adulterated milk by arbitrary standards (People v. Cipperly, 101 N. Y. 634, 4 N. E. 107, reversing 37 Hun, 319, on dissenting opinion of the general term); an act to prevent the manufacture or sale of a product not made from milk or cream "in imitation or semblance" of dairy butter, and put forth as the real article (People v. Arensberg, 105 N. Y. 123, 11 N. E. 277, 59 Am. Rep. 483); and the act which is the basis of the sections of the statute under discussion (People v. Girard, 145 N. Y. 105, 39 N. E. 823, 45 Am. St. Rep. 595). In the latter case the defendant had sold cider vinegar containing artificial coloring matter, and an action was brought to recover the penalties prescribed by a statute akin to the sections quoted, and a recovery was had, which was sustained by the court of appeals. The adulterated article was wholesome, and the coloring matter with which it was impregnated did not impair it as an article of food, but it was passed off for and designated as genuine cider vinegar; and that was the vice which the legislature had intended to prohibit. The court, in the course of its opinion, says:

"Food should be pure,—absolutely and unquestionably pure. No tricks should be played with it. The legislature may resolutely protect it. No artificial cider can ever be added to distilled vinegar for any good or honest purpose that I can imagine. * * * There is talk here of interference with the vested rights of the individual. Sometimes it is pertinent and weighty, but in this case it is neither. It becomes the assertion of a vested right to color a food product so as to conceal or disguise its true and natural appearance; in plain words, a vested right to deceive the public. * * * Adding a foreign and artificial ingredient to a food product. even for purposes of color merely, is, in effect, an adulteration; and whether it be so

described, or forbidden by more specific terms, is not material. The present law does not in the least interfere with the honest manufacture and sale of the distilled vinegar. It simply provides that it shall not be falsely colored. I think the legislature did not in this case, and under the circumstances existing, exceed its power."

The appellant's counsel, upon the assumption that the sales of vinegar were made without the state of New York, argues elaborately that the legislature, even though it may·regulate the manufacture and sale of a wholesome food product among its citizens, may not prevent its exportation to other states for sale, although manufactured in this state. It is claimed that by the constitution of the United States (article 1, § 8, subd. 3) that power is lodged with congress exclusively, and, as cider vinegar is a well-recognized article of commerce, the attempt of the state legislature to prohibit its manufacture or sale must be confined to the territory over which its authority extends. That may be a correct statement of the limitations of the power of the legislature, but it has no application to the present case, for the vinegar was not cider vinegar. The decision of the case does not rest upon the restriction or prevention of the manufacture or sale of the vinegar which the fruit company sold either in this state or beyond its domain. The effect of the judgment is to impose penalties upon the defendants for selling a spurious vinegar as and for cider vinegar. The damages awarded against them are for making an article in semblance of the unadulterated article, and deceiving the public thereby. Legislation restraining that cheat does not interfere with the commerce clause of the constitution, only as every interference with any kind of interstate trade may in a measure affect such traffic. In Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154, 39 L. Ed. 223, the plaintiff sold in the state of Massachusetts oleomargarine without any mark or designation upon the package to distinguish it from butter, which, by the addition of coloring matter, it closely resembled. The oleomargarine was manufactured in the city of Chicago, Ill., by a firm which was extensively engaged in the production of this article, and was disposed of in the original packages in various states of the Union. In Massachusetts there was a statute in force prohibiting the sale of any oleaginous substance in imitation of yellow butter, but the statute, in express terms, was not to be construed to prohibit the sale of oleomargarine if free "from coloration or ingredients that cause it to look like butter," and if the consumer is advised of its real character. The act prescribed a fine or imprisonment for its violation, and the plaintiff was convicted pursuant to that statute, which conviction was affirmed by the United States supreme court. That court stated the real issue before it in the following language:

"That question is whether, as contended by the petitioner, the statute under examination in its application to sales of oleomargarine brought into Massachusetts from other states, is in conflict with the clause of the constitution of the United States investing congress with power to regulate commerce among the several states."

After deciding that the Massachusetts statute did not prohibit the sale of oleomargarine, which is a well-defined article of commerce,

and hence did not trespass upon the commerce clause of the constitution, the court thus stated what one is interdicted from doing in the act there under review:

"He is only forbidden to practice in such matters a fraud upon the general public. The statute seeks to suppress false pretenses, and to promote fair dealing in the sale of an article of food. It compels the sale of oleomargarine for what it really is, by preventing its sale for what it is not. Can it be that the constitution of the United States secures to any one the privilege of manufacturing and selling an article of food in such manner as to induce the mass of people to believe that they are buying something which in fact is wholly different from that which is offered for sale? Does the freedom of commerce among the states demand a recognition of the right to practice a deception upon the public in the sale of any articles,—even those that may have become the subject of trade in different parts of the country?"

The court, after an elaborate analysis of many cases, thus sums up its conclusions:

"We are of the opinion that it is within the power of a state to exclude from its markets any compound manufactured in another state which has been artificially colored or adulterated so as to cause it to look like an article of food in general use, and the sale of which may, by reason of such coloration or adulteration, cheat the general public into purchasing that which they may not intend to buy. The constitution of the United States does not secure to any one the privilege of defrauding the public. The deception against which the statute of Massachusetts is aimed is an offense against society, and the states are as competent to protect their people against such offenses or wrongs as they are to protect them against crimes or wrongs of more serious character. And this protection may be given without violating any right secured by the national constitution, and without infringing the authority of the general government. A state enactment forbidding the sale of deceitful imitations of articles of food in general use among the people does not abridge any privilege secured to citizens of the United States, nor, in any just sense, interfere with the freedom of commerce among the several states. It is legislation which 'can be most advantageously exercised by the states themselves.' "

In Powell v. Pennsylvania, 127 U. S. 678, 8 Sup. Ct. 992, 32 L. Ed. 253, the statute of the state of Pennsylvania up for consideration absolutely prohibited the manufacture or sale of any compound in imitation of butter as an article of food. The validity of this statute was sustained by the court of last resort. It must be borne in mind, however, that at the time of the decision of this case oleomargarine had not obtained importance as a distinct commercial product, which accounts for a somewhat extended discussion of it in the Schollenberger Case, which is referred to more at length hereafter.

The contention of the appellants that legislation of this character is an infringement upon the regulation of interstate commerce, which is relegated exclusively to the congress of the United States, is without any merit. The restriction or interdiction of the free traffic in any legitimate article of commerce in disregard of any state boundary must not be caused by any state regulation. The judgment in this case does not involve any such interference. The sale of cider vinegar is not prohibited by the statute quoted, nor that of any other vinegar, unless by reason of its likeness to cider vinegar. Cider vinegar not only by statute in the state of New York has a definite meaning, but that definition accords with the description of the commodity understood in the trade. All that the act seeks to do is to

put its seal of disapproval upon the sending forth to deceive the public of an article which is not what it purports to be. To prevent a fraud the state interferes, and nips the cheat in its inception. It is also worthy of note, in passing, that in each of the states of Wisconsin and Michigan a similar statute prevails, preventing the sale of imitation cider vinegar for the genuine commodity, and with provisions corresponding to our own as to branding each cask containing this article.

In this case, however, to sustain the judgment we are not called upon to go to the extent of any of the cases adverted to. It will be observed that the statute upon which this action is founded prevents the manufacture for sale, the keeping for sale, or offering for sale of vinegar in imitation of cider vinegar, and also requires "the manufacturer or producer" to brand in the manner stated the package containing cider vinegar; and he is further prohibited from putting that brand upon any cask of counterfeit vinegar. The fruit company received two orders (one on the 3d and the other on the 4th of September) for a certain quantity of cider vinegar, and these orders were shortly after filled. The vinegar was in barrels in the possession of the company in the state of New York at the time the several samples were taken from it. The vinegar was, therefore, within the state of New York, not branded as required by the statute, but with a marking upon it that each barrel contained a specific quantity of pure cider vinegar. The vinegar had been manufactured, and was in possession of the manufacturer within the state of New York, ready for shipment as cider vinegar, and so designated, although not the real article. It had not then become a matter of commerce outside of the state. Everything done which constitutes the cause of action attached to this product before it left the state, and before any title became vested in the citizens of the sister states. The question of the infringement of the commerce clause of the constitution, consequently, is not a pregnant inquiry. Capital City Dairy Co. v. Ohio, 183 U. S. 238, 22 Sup. Ct. 120, 46 L. Ed. 171. Assuming that this vinegar was manufactured to fill the orders mentioned, that circumstance alone does not make it an article of interstate commerce; nor does it rest with the defendants to determine when it passes outside the realm of the state of New York and becomes a general commercial commodity. Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346; U. S. v. E. C. Knight Co., 156 U. S. 1–13, 15 Sup. Ct. 249, 39 L. Ed. 325. While not of any great moment, the record in this case does not show that this vinegar was manufactured specially to meet the orders referred to. In the case of Schollenberger v. Pennsylvania, 177 U. S. 1, 18 Sup. Ct. 757, 43 L. Ed. 49, relied upon by the appellants' counsel, the commodity assailed was oleomargarine manufactured in Providence, R. I., and shipped by the manufacturer to its agent in Philadelphia, in the state of Pennsylvania. The original package was properly stamped and labeled as oleomargarine, and was sold as such, and in the original package, to a customer residing in that city. The United States supreme court, in reversing the supreme court of Pennsylvania, held that oleomargarine was a legitimate and recognized article of commerce, and was a nutritious and wholesome food product, and, when sold as

oleomargarine, was not subject to regulation or control by state legislation to the extent of preventing its importation within the state. The court, however, was careful not to infringe upon the doctrine of the Plumley Case, above referred to, and did not hold that, if the commodity was being foisted upon the market as genuine butter, the state legislature might not prevent its sale, although imported from a sister state. The whole trend of the opinion is in the contrary direction. The recovery in the present case was based upon the manufacturing and selling of an imitation as and for the real article, and for marking the barrels as cider vinegar, when they did not contain that commodity; that is, the defendants were practicing deception upon the public, and that comprises the nub of the case, in distinction from the Schollenberger Case, and others relied upon by the counsel for the appellants.

We have not necessarily before us, to pass upon, the question whether subdivision 2 of section 51 of the statute in controversy is too far-reaching, in prohibiting the manufacture or keeping for sale of any vinegar in imitation of cider vinegar, but which is not so in fact; that is, if this article, though an imitation of cider vinegar, had been branded and put upon the market for precisely what it was, then a different question might be presented. But in construing this statute, as has been seen, by the court of appeals, in People v. Girard, supra, the court held that the addition of artificial coloring matter, even though innocuous, must be held to be done to perpetrate a cheat upon the public, and hence an adulteration, and within the condemnation of the statute. Doubtless, if the only way to prevent the manufacture and sale of the spurious product by reason of the closeness of its resemblance to cider vinegar is to strike at the root of the vice, by absolutely prohibiting its sale at all, then the legislature may do so. As was said in the Schollenberger Case, 171 U. S. 30, 18 Sup. Ct. 768, 43 L. Ed. 60:

"If the legislature is satisfied that oleomargarine is unwholesome, or that, in the tubs, pots, or packages in which it is commonly offered for sale, it looks so like butter that the only way to protect the people against injury to health, in the one case, or against fraud or deception, in the other, is to absolutely prohibit its sale, it is within the constitutional power of the legislature to do so."

It is quite common for municipalities and the legislature, within the police power of the state, to regulate and control, in a measure, any local traffic or business; and such regulations are upheld unless they are unjust or unfair, or impair the right of property without due process of law. The possession of this authority is essential to the public health. See Gundling v. City of Chicago, 177 U. S. 183-188, 20 Sup. Ct. 633, 44 L. Ed. 725.

The evidence in the record is ample to connect the appellants Hartmann and Hatch with the transaction in question. The judgment should be affirmed, with costs and disbursements to the respondent.

Judgment affirmed, with costs and disbursements to the respondent. All concur.