## Court of Appeals.

*March,* 1887.

## PEOPLE v. ARENSBERG.

### OLEOMARGARINE.

Section 7 of Laws 1885, chapter 183 (an act to prevent deception in the sale of dairy products, etc.,) forbidding the manufacture or sale of articles or products in imitation or semblance of, or designed to take the place of natural butter or cheese is constitutional.

To warrant a conviction, it is not necessary to show that the article sold was calculated to deceive the person who bought it in this instance.    It is enough that it was an imitation and semblance of butter, and calculated to deceive any one who might buy it.

The artificial coloring of oleomargarine for the mere purpose of making it resemble dairy butter is a violation of the statute.

APPEAL from a judgment of the general term of the supreme court in the second department, affirming a judgment of the court of sessions of King's county, of 10th December, 1886, convicting the defendant of the sale of articles or products in imitation or semblance of butter.

*Wheeler H. Peckham* and *Frederic R. Coudert,* for defendant appellant.

*Edward B. Thomas* and *William P. Quinn,* for the people, respondents.

RAPALLO. J.—The offense for which the appellant was indicted, and of which he was convicted, was that at, etc., he " did unlawfully, willfully and knowingly have in his possession for sale, keep for sale, offer, for sale, and cause and procure to be sold, to certain persons," etc., " a number of pounds of a certain article and product, made and manufactured in semblance and imitation of natural butter, that is to say, butter

made and produced from pure, unadulterated milk, and cream from the same,"etc., "the same not being then and there natural butter, as he (the said Lipman Arensberg) then and there well knew—against the form of the statute," etc.

The statute which the defendant was accused of violating was section 7 of chapter 183 of the Laws of 1885, entitled "A act to prevent deception in the sale of dairy products," etc. That section prohibits (1) the manufacture out of any animal fat, or animal or vegetable oils, not produced from unadulterated milk, or cream from the same, of any product in imitation or semblance, or designed to take the place of natural butter, produced from milk, etc.; (2) mixing, compounding with, or adding to milk, or cream or butter any acids or other deleterious substances, or animal fats, etc., with design or intent to produce any article in imitation or semblance of natural butter; (3) selling or keeping or offering for sale any article manufactured in violation of the provision of the section.

The indictment contains three counts, the first charging the defendant with manufacturing the prohibited article; the second, with mixing with milk, cream and butter the prohibited substances; and the third, with selling the prohibited article. He was acquitted on the first and second counts and convicted on the third.

The defendant contends that the provisions of the seventh section are in violation of the constitution of this State, and subversive of his constitutional rights of liberty, and the enjoyment of property, and he relies upon the decisions of this court in Re Jacobs, 98 N. Y. 98; 2 N. Y. Crim., and People v. Marx, 3 N. Y. Crim., 99 N. Y., id. 377.

The case of Jacobs arose under a different statute, and related to a different subject, viz., the manufacture of cigars in tenement houses. It has no bearing upon the present case, except in so far sa it declares general principles which are sought to be applied to the statute now in question.

The case of People v. Marx has a more direct application, as it arose under the act of which the one now under consideration is an amendment or supplement. The section under

which the defendant in that case was indicted was section 6 of chapter 202 of the Laws of 1884. That section provided as follows :

" SEC. 6. No person shall manufacture out of any oleaginous substance or any compound of the same, other than that produced from unadulterated milk, or of cream from the same, any article designed to take the place of butter or cheese produced from pure unadulterated milk, or cream of the same, or shall sell or offer to sell the same as an article of food."

That section was held to be unconstitutional, for the reason that the prohibition was not confined to unwholesome or simulated substances, but absolutely prohibited the manufacture or sale of any compound designed to be used as a substitue for butter or cheese, however wholesome or valuable, or however openly and fairly the character of the substance might be avowed and published ; that the act could not therefore be regarded as a health law, nor is intended to prevent deception by the sale of a simulated article as genuine ; and stress was laid in the opinion upon the fact that the prohibition was not of the manufacture or sale of an article designed as an imitation of dairy butter, but of any article designed to take the place of dairy butter, however dissimilar in color or appearance the artificial product might be to ordinary dairy butter. Other statutory provisions, aimed at the imitation of dairy butter were referred to without criticism, and without intimating any doubt of their validity. Among those were the provisions of chapter 215 of the Laws of 1882, which prohibit the introduction of any substance into imitation butter or cheese, for the purpose of imparting thereto a color resembling that of yellow butter or cheese.

Assuming, as is claimed, that butter made from animal fat or oil is as wholesome, nutritious and suitable for food as dairy butter ; that is composed of the same elements, and is substantially the same article, except as regards its origin; and that it is cheaper ; and that it would be a violation of the constitutional rights and liberties of the people to prohibit them from manufacturing or dealing in it, for the mere purpose of

protecting the producers of dairy butter against competition —yet it cannot be claimed that the producers of butter made from animal fat or oils have any constitutional right to resort to devices for the purpose of making their product resemble in appearance the more expensive article known as " dairy butter," or that it is beyond the power of the Legislature to enact such laws as they may deem necessary to prevent the simulated article being put upon the market in such form and manner as to be calculated to deceive.  If it possesses the merits which are claimed for it, and is innocuous, those making and dealing in it should be protected in the enjoyment of liberty in those respects ; but they may legally be required to sell it for, and as, what it actually is, and upon its own merits, and are not entitled to the benefit of any additional market value which may be imparted to it by resorting to artificial means to make it resemble dairy butter in appearance.  It may be butter, but it is not butter made from cream, and the difference in cost or market value, if no other, would make it a fraud to pass off one article for the other.

It is claimed on the part of the defense that the substance known as " oleomargarine " is composed of the same ingredients as dairy butter, with the exception only that the dairy butter naturally contains a small percentage (about five per cent, or more) of butyrine which is not to be found in the fats or oils used in the manufacture of oleomargarine, and has to be added by mingling some milk, cream, or butter with the oils ; and when this is done that oleomargarine and dairy butter are identical in substance, with the exceptions only that the former necessarily contains a smaller percentage of butyrine ; that consequently oleomargarine must resemble butter, and if the manufacture of any article made in imitation or semblance of butter is prohibited, the manufacture of oleomargarine is made unlawful.

We do not think that this result follows.  This statutory prohibition is aimed at a designed and intentional imitation of dairy butter, in manufacturing the new product, and not at a resemblance in qualities inherent in the articles themselves,

and common to both. If in their essential ingredients or elements the two articles were so identical that they must necessarily present the same appearance, without resort to any artificial means to produce the resemblance, it is argued on the part of the prosecution that in that case it would be competent for the Legislature to require that some means be resorted to by the manufacturers to distinguish the new article from the old; that the Legislature has attempted to do this by requiring that the package in which oleomargarine is sold be distinctly marked, and by other means; but that if all these precautions fail to prevent deception of consumers, then it is lawful to require, that in the manufacture of the substance itself, some measure should be adopted to make it distinguishable in appearance from the ordinary dairy butter— such as by giving to it a different color or some other device. We do not deem it necessary to pass upon this point, for in the evidence in this case there was sufficient to authorize the jury to find that the oleomargarine sold by the defendant and that which he had in his store exposed for sale, had by artificial means—not essential or incident to the manufacture of the article, but resorted to for the mere purpose of imitation—been made to resemble dairy butter; that it was yellow in appearance, and looked like butter. It was known to the defendant to be oleomargarine, and was sold and offered for sale by him as such.

There was evidence to the effect that the natural color of dairy butter was yellow, except when made in winter, when the cows were not grazing; that then it would sometimes be white or pearly, but that was exceptional. The oleomargarine purchased of the defendant was analyzed by a chemist employed by the State Dairy Association, and he testified positively that it had a coloring substance in it, and that it was added color; that a jar of it produced at the trial was delivered to him in June, 1885 (about eighteen months before the trial), and was then in the condition it was at the time he testified except that it was then full of a yellow preparation, and sealed up; that the article was then a much deeper yel-

low than at the time of the trial; that it could have been made without that color; that it was a golden yellow color, which was the color of natural butter, and that the natural color of oleomargarine fat was pure white.

Another witness for the prosecution, a chemist, who stated that he was familiar with butter, and with oleomargarine, testified that the natural color of oleomargarine was a pearly white, or creamy white, and that without any artificial coloring it did not resemble butter. Prof. Chandler, called by the defense, testified that oleomargarine butter was produced by churning oleomargarine oil with milk, and that if you desire to have a dark-colored butter a certain quantity of coloring matter was added, either carrot or annotto; that generally annotto was used; that it was the same coloring matter that was used for coloring cheese and butter in the dairies and on the farms. Being asked on cross-examination whether annotto and carrots were essential ingredients in the manufacture of oleomargarine butter, he testified that they could be left out or put in: that the only object of using them was to color the butter; also that they were not essential elements of dairy butter. He also stated that oleomargarine, without any color added, had about the same yellow as butter—white, or a little shade of yellow, practically white. But it is evident that he referred to winter butter, for afterward he stated that he had observed hundreds of specimens of winter butter, and they were nearly all white—about as white as oleomargarine before any coloring is put into it. Prof. Morton another witness called for the defense, disputed the efficacy of the tests by which the witness on the part of the prosecution claimed to have ascertained that the oleomargarine sold by the defendant was artificially colored. He testified that the constituent elements of oleomargarine were precisely the same as those found in dairy butter, the difference being only in the proportions of some of them; that dairy butter, when exposed to the sun, would bleach white, like chalk, and become tallow; that the color of oleomargarine oil was a rich cream color, and looked like melted butter; that annotto or

carrot, or any of the coloring matters used in oleomargarine butter, were not at all essential to the manufacture of that article any more than in the making of butter from cream, and the object of using them in making oleomargarine was to give it a pleasing color, and make it an acceptable article, just as it was used in dairy butter, when essential to make it a pleasing color; that people liked to see yellow butter; that the natural deep yellow color of butter did not indicate the richness of the butter, but that the public accepted it as summer butter, as distinguished from winter butter; that summer butter was valued more, and brought a higher price, and when coloring matter was used iu genuine butter the object was to make it resemble a rich-flavored and more marketable butter and the use of annotto and carrot in oleomargarine gave it a yellow color, and whatever value a yellow color gives ordinary butter. Another witness on the part of the defense testified on cross-examination that the color of butter was yellow, varying in shade, and that of oleomargarine yellowish; that the color imparted to it was not essential to the article itself, and the object of coloring it was to make it more palatable in appearance and marketable—to give it the appearance of butter; and he did not think it would meet with a ready sale if it had no color, and that the same rule would apply to dairy butter.

The judge, in submitting the case to the jury on the third count, instructed them that they must be satisfied beyond a reasonable doubt that the defendant did sell the article called oleomargarine; that it was not made from pure unadulterated milk, or cream of the same; and they must further be satisfied beyond a reasonable doubt that the article so sold was in imitation and semblance of butter, and calculated to deceive; and if they found either of these facts in the negative it was their duty to acquit. He further charged that it was not necessary to show that the article sold was calculated to deceive the person who bought it in this instance, but that it was in imitation and semblance of butter, and calculated to deceive any person who might buy it. Exceptions

were duly taken to the charge, raising the question of the constitutionality of the act under which the defendant was indicted; and also to refusals of the court to charge, raising the points made on the part of the defense, that it was necessary that the purchaser from the defendant should have been deceived; that if the article sold was substantially identical with butter, they must acquit; and that the words "imitation or semblance" meant a fraudulent imitation or semblance as to which the court charged that the words meant an imitation or semblance likely to deceive. The jury having found the defendant guilty, the court sentenced him to pay a fine of $100.

We think that the evidence justified the court in submitting to the jury the question whether the article sold was an imitation calculated to deceive. It was sufficient to authorize a finding that it had been artificially colored so as to imitate the most valuable kind of dairy butter; that such coloring was not essential or necessarily incident to its manufacture, and that its only object was to make it resemble dairy butter, and increase its market value. There may have been some conflict in the evidence on these points, but in the main they were established. At all events, the evidence was sufficient to authorize the jury to find those facts, and we are of opinion that such artificial coloring of oleomargarine, for the mere purpose of making it resemble dairy butter, comes within the statutory prohibition against imitation; and that such prohibition is within the power of the Legislature, and rests upon the same principle which would sustain a prohibition of coloring winter dairy butter for the purpose of enhancing its market-place, by making it resemble summer dairy butter, should the Legislature deem such a prohibition necessary or expedient. We have examined the various exceptions taken to the charge, and refusals to charge, and to rulings on questions of evidence on the trial, and find none which require a reversal of the judgment. An application of the general conclusions which we have reached will substantially answer them without going over them in detail.

· The judgment of the General Term should be affirmed.

. All concur, except PECKHAM, J., taking no part.

NOTE.—Under its general police power the State may prescribe by statute the qualifications of persons engaging in the practice of medicine and surgery, and require that they should procure a license. *Eastman* v. *State,* (Ind.) 10 N. E. Rep. 97; 7 West. Rep. 41S.

The Pennsylvania Act of May 21st, 1885 (P. L. 22,) entitled "An Act for the protection of the public health and to prevent adulteration of dairy products and fraud in the sale thereof," is a valid execution of the police power and not unconstitutional. *Howell* v. *Commonwealth* (Pa.), 7 Atlantic Rep. 913.

A statute requiring physicians to register and granting registration upon passing a proper examination or proof of reputable practice of the profession for five years previous to the enactment of the statute, is a valid exercise of the police power of the State. *Richardson* v. *State,* (Ark.) 2 S. W. Rep. 187.

Maryland Acts 1884, chapter 213, requiring oleomargarine sold to be stamped as such, is plainly within the constitutional power of the legislature. *Pierce* v. *State,* 63 Md. 592.

Where the political power of a State for the safety of its people takes the responsibility of saying that certain occupations are hurtful and will not be permitted in its boundaries unless that declaration is so unreasonable as to be outside the domain of law, the occupation so stigmatized is no longer a right, privilege or immunity within the meaning of the constitution. *In re Hoover,* 30 Fed. Rep. 51.

Alabama session acts 1878–79, p. 206, prohibiting the transportation by night within certain counties of " any cotton in the seed," and making it "unlawful for any persons to sell or offer for sale, barter, exchange or buy" within said counties "any cotton in the seed " held not unconstitutional but a lawful exercise of the legislature's police power. *Mangan* v. *State,* 76 Ala. 60.

A city by ordinance may prohibit washing and ironing in public laundries between the hours of 10 p. m. and six a. m. This is a legitimate exercise of the police power, and impairs no constitutional right. *Barbier* v. *Connolly,* 113 U. S. 27; *Soon Hing* v. *Crowley,* id. 703.

A city ordinance that makes it an offense to carry on a laundry where clothes are washed for pay within the habitable portion of the city is unconstitutional. Re Tie Loy, (Stockton Laundry Case), 26 Fed. Rep. 611.

An act to regulate the sale of opium and to suppress opium dens which forbids its sale or gift except on a physician's prescription to any person other than druggists or physicians, is constitutional. *Ex parte* Yung Jon, 28 Fed. Rep. 308.

A San Francisco ordinance conferred unlimited powers on certain officials to grant or refuse leave to carry on public laundries in wooden buildings. The power was exercised wholly against Chinamen and in favor of all others. *Held,* an unlawful discrimination. *Yick Wo* v. *Hopkins,* 118 U. S. 356.