## In re BRUNDAGE.

### (Circuit Court, D. Minnesota. September 21, 1899.)

1. CONSTITUTIONAL LAW—OLEOMARGARINE—INTERSTATE COMMERCE.

Oleomargarine is a lawful subject of commerce, and a state statute (Act Minn. April 19, 1899, § 16) which prohibits the sale of oleomargarine so colored as to resemble butter is unconstitutional and void in so far as it applies to a sale within the state of oleomargarine manufactured in another state, and imported by the agent of the manufacturer, and sold by him in the original and unbroken packages of importation, stamped and marked as required by the act of congress of August 2, 1886 (24 Stat. 209), the product being composed of the materials described in said act as constituting lawful oleomargarine of commerce.

2. HABEAS CORPUS—IMPRISONMENT UNDER VOID STATE STATUTE—COMITY.

A federal circuit court has jurisdiction to release on habeas corpus a person sentenced to imprisonment upon conviction in a state court of a violation of a penal statute of the state, which statute is void for conflict with the constitution of the United States; but for comity's sake it will not exercise this power unless where large interests, affecting the business of many, or the rights of the public, are so involved that serious consequences would follow from the delay necessary to the prosecution of a writ of error, or unless the state court, in convicting the prisoner under the statute, has disregarded a decision of the United States supreme court upon the question at issue.

On Habeas Corpus.

H. D. Dickinson, for the State.
C. A. Severance, for defendant.

LOCHREN, District Judge. This case arises from the attempted enforcement of a statute of the state of Minnesota designed to prevent the sale, or having in possession for the purpose of sale, of oleomargarine colored with any coloring matter so as to resemble butter made from cream. Section 16 of an act of the legislature of the state of Minnesota, entitled "An act to prevent fraud in the sale of dairy products, their imitations or substitutes, to prohibit and prevent the manufacture or sale of unhealthy or adulterated dairy products, and to preserve the public health," approved April 19, 1899, reads as follows:

"Sec. 16. No person, by himself or his agents, or his agents or servants, shall manufacture for sale, have in his possession with intent to sell, expose or offer for sale, or sell as butter or as cheese, or as substitutes for butter or cheese, or as imitations of butter or cheese, under any name or title whatsoever, any mixture or compound, which is designed to take the place of butter or of cheese, and which is made from animal or vegetable oils or fats, or by the mixing or compounding of the same, or any mixture or compound consisting in part of butter or of cheese in mixture or combination with animal or vegetable oils or fats, nor shall any person mix, compound with or add to milk, cream, butter or cheese any animal or vegetable oils or fats, with design or intent to make or produce any article or substance in imitation of butter or cheese, nor shall any person coat, powder or color with annotto or with any

other coloring matter whatever, butterine or oleomargarine or any mixture or compound of the same, or any article or compound made wholly or in part from animal or vegetable oils or fats not produced from milk or cream, whereby the said article or compound shall be made to resemble butter or cheese, nor shall any person offer or expose for sale or sell any article, substance or compound made, manufactured or produced in violation of the provisions of this section, whether such article, substance or compound shall have been made, manufactured or produced within this state or in any other state or country; and the having in possession by any person, firm or corporation of any article, substance or compound made, manufactured or produced in violation of the provisions of this section shall be considered as prima facie evidence of an intent to sell the same as butter or as cheese contrary to the provisions of this section."

The violation of any of the provisions of this act was made a misdemeanor, punishable by fine or imprisonment. The petition and return show that upon complaint made and filed in the municipal court of the city of Minneapolis the petitioner, Charles N. Brundage, was charged with having, on the 22d day of May, 1899, at said city, willfully and unlawfully offered and exposed for sale, and having in his possession with intent to sell, "a quantity of a certain compound designed to take the place of butter, and made in part from animal and vegetable oils and fats not produced from milk or cream, said compound being an article commonly known as 'oleomargarine,' and being then and there colored with a coloring matter whereby the said article and compound was made to resemble butter"; whereupon a warrant was issued by said court upon which the petitioner was arrested, and upon trial was by said court convicted, and sentenced to pay a fine of $25 and $3 costs, or be imprisoned in the workhouse of said city for the term of 30 days at hard labor. As the petitioner did not pay the fine, he was taken into custody by Harry M. Burke, a police officer of said city, upon a warrant for his commitment to the said workhouse. On the hearing it was admitted that all the testimony at said trial was correctly set forth in Exhibit A, attached to said petition. From this testimony it appears, in brief, that the petitioner was and is the manager of the business at Minneapolis of the Hammond Packing Company, an Illinois corporation, dealing at wholesale in beef and provisions, including oleomargarine; and that on May 22, 1899, William C. Corbett, an inspector of the state dairy and food department of the state of Minnesota, asked for and purchased from the petitioner, at the place of business of said Hammond Packing Company, a 10-pound package of oleomargarine for the sum of $1.40, paid by him therefor. The said 10-pound package was an original package of oleomargarine, manufactured by the G. H. Hammond Company, of Hammond, in the state of Indiana; the inclosure of the package being a wooden box, having thereon the revenue stamps and marks required by law; and upon the sale thereof at said Hammond was thence consigned by railroad by the said manufacturer to the purchaser, the Hammond Packing Company, at Minneapolis, where it was received by the said purchaser, and sold entire in the same package to said William C. Corbett, who thereafter made in said municipal court the said complaint upon which said petitioner was prosecuted as aforesaid. The oleomargarine so sold was the

well-known article of food and of commerce of that name; entirely wholesome, and fit for consumption as human food, and colored with the ordinary wholesome ingredients used in the manufacture of that article to impart to it the color of the best dairy butter. On such sale it was represented and sold as oleomargarine, which was the article asked for by the purchaser. Oleomargarine has for some years, in states like Minnesota, having large dairy interests, been the subject of hostile legislation, because it comes in competition with and is a substitute for butter, and, supplying its place at less cost, diminishes the price of that article and the profits of the dairymen; and also because of the facility with which it can, by dishonest dealers at retail, and keepers of inns and boarding houses, be put off as butter upon customers and patrons who desire only butter, and would not knowingly use oleomargarine. In the earlier cases in which the validity of this legislation was questioned it was sustained by the courts. It could not rest on the admitted right of every state as matter of police regulation to provide for the inspection of articles of food put upon its markets, and for the confiscation or destruction of such articles as were found to be deleterious or unwholesome, because the legislation referred to, of which the section above quoted of the Minnesota statute is a sample, provides for no inspection, and aims to prohibit and exclude from the markets of the state an article of food presumably wholesome and fit for human consumption, simply because of the fact that, as customarily prepared and colored to make it attractive and marketable, it is made to resemble perfectly another article of food, for which it is a substitute, and is thus liable to be mistaken for that article, and to be fraudulently imposed upon consumers as that article. In People v. Arensberg, 105 N. Y. 123, 11 N. E. 277, it was held that, assuming oleomargarine to be as wholesome, nutritious, and suitable for food as dairy butter, and in fact the same article except as regards its origin, and that it is cheaper, yet, to protect the people from deception, the legislature could prohibit the sale or keeping or offering for sale of oleomargarine, to which, in its manufacture, a coloring matter not injurious to health had been added to make it resemble the best dairy butter. It was intimated that the legislature had the power to prohibit the like coloring of winter butter to make it resemble summer butter; and the then mooted question whether, in case the essential ingredients of oleomargarine should produce an article identical in color and appearance with dairy butter, the legislature could require that a different color be given to oleomargarine to distinguish it from butter, was stated, but not passed upon. Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154, was in all essentials like the present case. The statute of Massachusetts under which Plumley was convicted prohibited the sale, offering or exposing for sale, or having in possession with intent to sell any article, product, or compound made wholly or partly out of any fat, oil, or oleaginous substance or compound thereof, not produced from unadulterated milk or cream from the same, which shall be in imitation of yellow butter produced from pure unadulterated milk or cream; with a proviso that nothing in

the act should be construed to prohibit the sale of oleomargarine in a separate and distinct form, and in such manner as will advise the consumer of its real character, free from coloration or ingredient that causes it to look like butter. Plumley was the Boston agent of an Illinois firm engaged in the manufacture of oleomargarine at Chicago, and in shipping the same for sale to various towns and cities of that and other states, and there selling the same; and Plumley was convicted by the municipal court of Boston for selling one original 10-pound package of oleomargarine, shipped to him by the manufacturers; it being admitted that the article was wholesome, nutritious, and palatable, and that the acts of congress had been complied with as to marks, words, and stamps on the package. Being taken, upon writ of commitment, to jail, after such conviction, and failure to pay the fine imposed, Plumley sued out a writ of habeas corpus from the supreme judicial court of Massachusetts on the ground that he was restrained of his liberty in violation of the constitution of the United States; claiming that the Massachusetts statute was repugnant to the clause of the constitution providing that congress shall have power to regulate commerce among the several states, and setting up all the grounds of invalidity which are here urged against the Minnesota statute. The supreme judicial court held that the Massachusetts statute was not in violation of the constitution or laws of the United States, and remanded the prisoner, who took the case by writ of error to the supreme court of the United States. That court held that the Massachusetts statute, in its application to sales of oleomargarine artificially colored, so as to cause it to look like yellow butter, and brought into Massachusetts, was not in conflict with the clause of the constitution of the United States investing congress with power to regulate commerce among the several states; and that a state has the power to prevent the sale of articles of food manufactured in and brought from another state, being subjects of sale and commerce, if their sale may cheat the people into purchasing something they do not intend to buy, and which are wholly different from what their condition and appearance import. Among the cases cited in the opinion of the court with apparent approval are State v. Marshall, 64 N. H. 549, 15 Atl. 210, and Weideman v. State, 56 N. W. 688, which is the same case reported as State v. Horgan, 55 Minn. 183. In each of these two cases the court had sustained the validity of state statutes forbidding the sale, or having in possession with intent to sell, of any article or compound made in imitation of butter, or as a substitute for butter, and not wholly made from milk or cream, and that is of any other color than pink. Three of the justices of the supreme court, including the chief justice, dissented from the decision of the court in the Plumley Case, denying that a state may exclude from commerce legitimate subjects of commercial dealings because of the possibility that their appearance may deceive purchasers in regard to their qualities. But the decision of the court seemed to settle the law on the subject, and when the question of the validity of the Minnesota act of 1891 (Laws 1891, c. 11), which, in its effect, forbade the sale of oleomargarine unless colored bright

pink, being the identical statute which had been held valid by the Minnesota supreme court in 55 Minn. 183, 56 N. W. 688, came before me in Packing Co. v. Snyder, 84 Fed. 136, I regarded the tenor of the Plumley decision, and its apparent approval of the Minnesota and New Hampshire decisions just referred to, as conclusive authority in support of the validity of the Minnesota act of 1891. Since then the whole subject has again been considered and passed upon by the supreme court of the United States in Schollenberger v. Pennsylvania, 171 U. S. 1, 18 Sup. Ct. 757, and Collins v. New Hampshire, 171 U. S. 30, 18 Sup. Ct. 768. In the Schollenberger Case it is held that oleomargarine has been recognized for nearly a quarter of a century in Europe and the United States as an article of food and commerce, and has been so recognized by acts of congress; and, being thus a lawful article of commerce, it cannot be wholly excluded from importation into a state from another state where it was manufactured, although the state into which it is introduced may so regulate the introduction as to insure purity; and that, as an incident to the right to import, the importer may personally or by his agent sell the imported article in the original packages, either to dealers or consumers; and that the statute of Pennsylvania of May 21, 1885, enacting that "no person, firm or corporate body shall manufacture out of any oleaginous substance, or any compound of the same, other than that produced from unadulterated milk or cream from the same, any article designed to take the place of butter or of cheese produced from pure unadulterated milk or cream from the same, or of any imitation or adulterated butter or cheese, nor shall sell or offer for sale, or have in his, her or their possession, with intent to sell the same as an article of food," and making such act a misdemeanor, is invalid to the extent that it prohibits the introduction of oleomargarine from another state, and its sale in the original package. As a fact of the first importance in determining that the manufacture of oleomargarine is a lawful pursuit, and the manufactured article a legitimate subject of commerce, the court refers to the act of August 2, 1886 (24 Stat. 209), "An act defining butter, also imposing a tax upon and regulating the manufacture, sale, importation and exportation of oleomargarine," which levies special taxes upon manufacturers and dealers in that article, and directs the kinds and sizes of the packages, and the marks, brands, and stamps to be placed thereon, and that sales thereof shall only be made in and from such original stamped packages, and for surveillance by officers of the government over the manufacture of the article, and its forfeiture if found to contain ingredients deleterious to the public health. One description of oleomargarine contained in this act includes "all mixtures and compounds of tallow, beef fat, suet, lard, lard oil, vegetable oil, annotto, and other coloring matter, intestinal fat, and offal fat made in imitation or semblance of butter." The decision of the court in the Schollenberger Case certainly goes to the extent of holding that the manufacture of oleomargarine by the compounding of the ingredients named in this quotation from the act of August 2, 1886, is recognized by congress as being a lawful business, and that the oleomargarine so produced

is a lawful article of commerce. It follows, and is distinctly held in that case, that any act of a state legislature assuming to prohibit the importation into the state and sale there by the importers of such article in original packages is invalid, being inconsistent with the exclusive power of congress over the subject of commerce among the several states.

Comparing section 16 of the Minnesota act of April 19, 1899, under which the petitioner is prosecuted, with the above quotation from the act of congress of August 2, 1886, it is obvious that the Minnesota act, by its terms, prohibits, and attemps to exclude from the state, oleomargarine compounded of the very materials, including coloring matters, which are described in said act of congress as constituting lawful oleomargarine of commerce, "made in imitation or semblance of butter." According to the decisions of the supreme court in the Schollenberger and Collins Cases, the Minnesota act is, to this extent, invalid; and, as the conviction and imprisonment of the petitioner rest solely upon this invalid portion of that act, the conviction was null, and the imprisonment was unlawful.

The argument that oleomargarine colored to resemble butter is adulterated by such coloring, so that it may for that cause be excluded from the markets of the state under its unquestioned power to exclude any article of food which is unwholesome or deleterious, fails, because there is no pretense that the coloring matter contained in the oleomargarine sold by the petitioner was unwholesome, or that the oleomargarine so colored and sold was different from the "pure oleomargarine" mentioned in the opinions of the supreme court referred to; pure, not as containing no mixture, because oleomargarine is a compound of many ingredients, but pure in the sense of containing nothing debasing, or of a character which would render the article less wholesome, valuable, or desirable. The doctrine, which has apparent support in the Plumley Case, that a state may exclude from its markets, and absolutely prohibit the sale of, an admittedly wholesome article of food merely because it is designedly prepared to resemble so closely another more generally desired article, for which it is a substitute, that persons may be easily deceived, and have it imposed upon them for the other article, is plainly contrary to the holding in the Schollenberger Case, and untenable since that decision, in which the court announces that "the legislative policy does not extend so far as to embrace the right to absolutely prohibit the introduction within the limits of the state of an article like oleomargarine, properly and honestly manufactured."

As to whether, in a case like this, the court should discharge the prisoner on habeas corpus, or, by remanding him, leave him to the remedy of a writ of error, it is hardly necessary to refer to the very numerous authorities. If the imprisonment is upon regular process of a court having jurisdiction, and the prosecution is had under a valid law, alleged errors cannot, usually, be considered upon habeas corpus. But if the court issuing the process under which the prisoner is imprisoned had no jurisdiction, or if the prosecution is under

an unconstitutional and invalid statute, the circuit court has jurisdiction to discharge the petitioner on habeas corpus. Even then, for reasons of comity, such power will seldom be exercised by the circuit court to discharge a petitioner held under process from a state court, even after conviction by the trial court, unless large interests affecting the business of many or the rights of the public are so involved that serious consequences will follow from the delay which will be caused by the prosecution of a writ of error to a final decision, or unless the question has already been decided by the supreme court of the United States, whose decision the state court has disregarded in the proceeding. State statutes prohibiting the importation from other states and sale of articles of commerce, especially articles of food, or adapted for general use, are regarded as affecting general interests and the rights of the public; and habeas corpus has frequently been resorted to in cases of imprisonment for violation of such statutes. Minnesota v. Barber, 136 U. S. 313, 10 Sup. Ct. 862; Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154; State of Iowa v. McGregor, 76 Fed. 956. As this is a case of that character, and as the unconstitutionality of statutes in effect like the Minnesota statute under consideration has been adjudged by the supreme court of the United States in the latest cases in that court upon the subject, the petitioner will be discharged from the imprisonment complained of.