# COURT OF SPECIAL SESSIONS — NEW YORK CITY.

## June 28, 1916.

## THE PEOPLE v. EXCELSIOR BOTTLING WORKS, INC.

SANITARY CODE—SECTION 68, SUBS. 6F—ADULTERATING SODA WATER—
    SACCHARIN—STRAWBERRY SODA—CONSTITUTIONAL LAW.
    Section 68 of the Sanitary Code and the resolution of the Board of
Health of New York of August 22, 1911, that foods or food products
containing saccharin be deemed adulterated under said code, were
enacted in good faith to safeguard the public health, and in pursuance
of a reasonable exercise of the police power and are constitutional.
    COLLINS, J., dissenting.

CHARGE:— Violation of section 68 of the Sanitary Code.
Adulterating soda water.

PRESENT:—HON. CORNELIUS F. COLLINS, ISAAC FRANKLIN
RUSSELL and GEORGE J. O'KEEFE, JJ.

APPEARANCES:— *Frank L. Polk, Esq., Corporation Counsel
(by William H. Kehoe, Esq., Deputy Assistant Corporation
Counsel, of counsel)*, for the People; *Breed, Abbott and Morgan
(William C. Breed, of counsel)*, for the defendant.

RUSSELL, C. J.:
    The complaint charges that on the 31st day of August, 1914,
at the city and county of New York, the Excelsior Bottling
Works, a domestic corporation, was a dealer in food and car-
ried on business at No. 407 East 121st street in the city of New
York, and, at the time and place aforesaid, did keep and offer
for sale as food for man, certain food which was adulterated,
to wit: a beverage named and called Strawberry Soda; that the

said article of food contained saccharin, and that saccharin when mixed with the liquid aforesaid, did injuriously affect its quality; that the said saccharin is a substitute for sugar and is an inferior substance substituted for sugar in the said article offered for sale as aforesaid, that the said ingredient consisting of saccharin is a deleterious ingredient and may render the said article of food injurious to health; all in violation of the Sanitary Code of the Board of Health of the Department of Health of the city of New York, at all the times mentioned in the said complaint and then in full force and operation in the city and State of New York, county of New York, especially in violation of section 68 of said Sanitary Code, subdivisions (b) and (f), under the designation *Food*, which said section, so far as the same concerns this proceeding, is as follows, to wit:

" Section 68.  No person shall have, sell or offer for sale in The City of New York any food which is adulterated, *or misbranded*.  The term food as herein used shall include every article of food and every beverage used by man and all confectionery.

Food, as herein defined, shall be deemed adulterated:   *   *   *

(b) If any inferior or cheaper substances have been substituted wholly or in part for the article.   *   *   *

(f) If it contains any added poisonous ingredient, or any ingredient which may render such article of food injurious to health; or if it contains any antiseptic or preservative not evident and not known to the purchaser or consumer."

The complaint further charges that the facts set forth are all in violation of a resolution of the Board of Health of the city of New York, which resolution was duly passed at a meeting of the said board, held on the 22d day of August, 1911, and which reads as follows:

" Resolved, that foods, or food products containing saccharin be deemed adulterated under the Sanitary Code."

Under section 1262 of the charter of the city of New York

the Board of Health may, in addition to revising, amending or altering the Sanitary Code, enact regulations for the protection of life and the care, promotion or preservation of the public health. The resolution of the Board of Health above quoted is a regulation under section 68 of the Sanitary Code, declaring saccharin to be an adulterant. The resolution was duly published according to law and defendant had legal notice thereof.

The defendant's counsel urges that said section 68 of the Sanitary Code and the said resolution of the Board of Health are obnoxious to both the State and Federal constitutions, as follows:

(a) That the prohibition of the sale of bottled soda water containing 1/100 of 1 per cent of saccharin, and disclosing upon the label the use of such saccharin, violates valuable property rights of the defendant, and is in violation of article one, section six, of the Constitution of the State of New York and also the Fourteenth Amendment of the Constitution of the United States.

(b) That section 68 of the Sanitary Code, if construed to prohibit the use of saccharin in food products as a sweetener or condiment, in the same class as pepper, salt, cinnamon, allspice, ginger or flavoring ingredients, is an unnecessary and unlawful exercise of the police power, and is in violation of article one, section six, of the Constitution of the State of New York, and also the Fourteenth Amendment of the Constitution of the United States.

Article one, section six of the Constitution of the State of New York provides:

" No person shall be   *   *   *   deprived of life, liberty or property without due process of law; nor shall private property be taken for public use without just compensation."

The Fourteenth Amendment to the Constitution of the United States provides, in part:

" No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;

nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Every presumption is in favor of the constitutionality and validity of a statutory enactment.  (People ex rel. Kemmler v. Durston, 119 N. Y. 569, 577.)  " We cannot overturn a statute because we do not like it, for our likes and dislikes affect us as citizens, not as judges."  (Wright v. Hart, 182 N. Y. 330, 353.)

Before we can pronounce such a statute as that now before us unconstitutional we must be able to see, either that there is no real, substantial evil of public interest to be guarded against, or that there is no reasonable relation between the evil and the proposed cure or prevention offered by the statute.  (Booth v. Ill., 184 U. S. 425; Chicago, B & Q. R. R. Co. v. McGuire, 219 U. S. 549.)

Saccharin is a substitute for sugar and itself has no food value.  Under the authorities, although as an ingredient of food it may not be deleterious, still its use can be absolutely prohibited.  An article may be manufactured in imitation or semblance of a well-known article in common use and consumers or purchasers may be thus imposed upon.  Legislation intended to prevent such an article being manufactured has been held valid.  (People v. Biesecker, 169 N. Y. 53.)

The Legislature certainly cannot forbid or wholly prevent the sale of a wholesome article of food.  But in forbidding the sale and use of saccharin as food no attempt was made to prevent the sale of a wholesome article of food.  Saccharin is not a food, but a product of coal-tar, a synthetic substance from a laboratory. The object of such regulation was to prevent imposition and fraud.

It has been held that the police power includes the right to prohibit the sale of any article of food or drink deemed to be deceptive as well as wholesome. (Bartemeyer v. Iowa, 18 Wall.

129; Beer Co. v. Massachusetts, 97 U. S. 25; People v. Marx, 99 N. Y. 377; People v. Arensberg, 105 N. Y. 123.)

Nor will a suitable label afford a sufficient protection to the public against fraud. The blind and illiterate are entitled to the full protection of the law. Then, too, a certain amount of nourishment will surely be lost if saccharin is permitted to displace sugar as a sweetener.

The adulteration of milk by adding water may be cited as to some extent analogous. Water is not injurious to the human system but on the contrary is absolutely necessary to preserve health. Still this city and every other city in the land has established a standard of quality for milk in order to prevent fraud and loss of nourishment. Most of the authorities cited are oleomargarine cases. Oleomargarine has food value; so the substitution of oleomargarine for butter means the substitution of one food for another food. Similarly the substitution of water for milk means the substitution of one food for another food. But in the case under discussion we have to deal with the substitution of that which has no food value for that which has high food value.

Our attention has been directed to a recent decision of the United States Supreme Court, the bleached flour case, so-called, — as a controlling authority in favor of the defendant. The Act of Congress, known as the Food and Drugs Act of 1906, forbade adulteration and misbranding of food, and provided against the addition to pure food of any poisonous or deleterious ingredients which might render the article injurious to health. In that case nitric acid was used in a bleaching process in order to impart to the flour the color of a better grade. The precise language of the act in subdivision five of section seven provided that food shall be deemed adulterated " if it contain any added poisonous or other added deleterious ingreient *which may render such article injurious to health.*" This act placed upon the government the burden of establishing that the added substance

must be such in quantity as may render the article of food injurious to health. No substantial proof was offered at the trial showing that the flour was mixed, colored or stained in a manner whereby damage or inferiority were concealed. The conviction was properly reversed for such failure of proof. The adjudication has no controlling authority over the case at bar in the view of the different language used in the Sanitary Code and the resolution of the Board of Health. It is interesting, moreover, to note that learned counsel in the bleached flour case never challenged the constitutionality of the statute on any ground.

The testimony in this case is very voluminous and covers about 477 pages of stenographic minutes. Eighteen witnesses were examined at length, several of whom are world-famed scientists, and eminent in the medical profession as food experts. This record, at least, shows that there is a difference of opinion among those best qualified to judge respecting saccharin and on the question of excluding saccharin from foods.

We conclude that section 68 of the Sanitary Code and the resolution of the Board of Health to the effect that foods containing saccharin be deemed adulterated, were enacted and passed in good faith to promote the general welfare and safeguard the public health; that they were so passed in pursuance of a reasonable exercise of the public power; and that they are not obnoxious, in any respect, to the provisions of the Constitution of the United States, or the Constitution of the State of New York. The motions made on behalf of defendant to dismiss the complaint, and in arrest of judgment are denied. The defendant is adjudged guilty.

O'KEEFE, J., concurs in the result.

O'KEEFE, J.:

The ordinance in question is enacted by reason of power conferred upon the health department of the city of New York and

in this city has the force of statute. If it be a valid exercise of the police power and in the interest of the health of the city of New York, then, in this instance, it has been violated. If it be oppressive and unjust, then it should not be supported by a judgment of conviction. I believe the ordinance in question to be a valid exercise of police power and in the interest of the health of the people of the city of New York.

Some argument has been made that labeling or branding articles for human consumption would apprise the intending consumer that saccharin entered into it as an ingredient. How little we all know about saccharin, was demonstrated when we listened to the very interesting testimony given by the witnesses produced on both sides, men, chemists, physicians and scientists of world-wide reputation.

I vote for the denial of the motions made by the defense and for the conviction of the defendant.

COLLINS, J. (dissenting):

Defendant, a manufacturer of soda water, sold two nine ounce bottles of a beverage labeled "Strawberry, sweetened with sugar and one-one-hundredth of one per cent of saccharin (Benzosulphinide)". On the trial, the fact was admitted, and the evidence in the case was directed solely to the questions of law involved, to give the court light in passing on the reasonableness of the ordinance or regulation, following the practice indicated in People v. Schwenler (214 N. Y. 395). As has been pointed out in the prevailing opinion, the testimony in this case was voluminous. Scientists of world-wide reputation testified, including medical men, chemists and food experts. It may be said that the subject of the use of saccharin in foods was fully covered — with the result that it is conceded by experts that to the extent with which saccharin may be commercially used in food preparations, it is not unwholesome or deleterious to health. Experts on both sides agreed with this conclusion, and the prose-

cution conceded that no effort would be made to sustain the regulation on the theory that the use of saccharin, as stated, was injurious to health, but would base its contention "upon the ground, solely, that the use of saccharin in food is a virtual fraud on the public."

It is undisputed that saccharin is a synthetic coal-tar product having a proportionate quality of sweetness five hundred times greater than sugar. That of itself, it has no caloric food value. It seems to me to have been established conclusively though, that it has a positive value as a food accessory in that it imparts to food a quality of sweetness that makes it palatable and agreeable to the taste and thus, where sweetness is desirable, serves the purpose of supplying a flavor to food, which if not sweetened would not be agreeable to the consumer, and consequently tend to discourage its consumption.

Sugar has a caloric food value as well as the quality of sweetness. But, as was pointed out by the experts for the defense, there are numerous instances in which the consumer is not seeking a caloric food value sweetness. For example, on a hot day one may desire a palatable "strawberry soda" for the sole purpose of quenching thirst, and may deliberately avoid sugary food value because it might otherwise interfere with one's appetite. Then too, there are quite a number of people undesirably adipose who seek flavor, but wish to partake of sugar sparingly, who would prefer food sweetened in part with saccharin, if convinced that it was not injurious to health, while others, so assured, may be indifferent as to whether the sweetening is sugar or saccharin.

The contention is made that saccharin, having no food value, is used to supplant an article of food value and its use is therefore inherently fraudulent. It was pointed out by the experts for the defense that the very great difference in bulk between sugar and saccharin, instead of affording added opportunities for fraud, really reduced such opportunity to a minimum, for

the reason that the absence of sugar in a sweetened product of a given weight or in standardized sized cans, must be supplied by added portions of the product itself, which in almost every instance where sweetening is used is more valuable as a food than sugar.   Canned corn was referred to as an illustration of this fact where the absence of sugar must be supplied with corn. It would appear from the opinions of the experts that the only instance in which saccharin might be employed so. as to reduce the caloric food value of a product, the uniformity of the bulk of which is maintained, is in beverages.

Granted, however, that the use of saccharin is susceptible of fraud, that a consumer might in some instances be deceived, and thus deprived of a desired food value; may the use of saccharin be absolutely prohibited?   At the present time, because of the European conflict, its cost prohibits its use in competition with sugar, but under normal conditions it has a great commercial value and its use developed an industry of considerable proportion.   The right to produce and offer it for sale is a property right which may not be interfered with except in the exercise of a reasonable police power.   The prosecution contends that its use comes within the doctrine laid down in People v. Arensburg (105 N. Y. 123); People v. Kibler (106 N. Y. 321), and People v. Girard (145 N. Y. 105), which sustains statutes intend to prevent the use of fraudulent food commodities, while the defense contends that its use comes within the doctrine laid down in People v. Marx (99 N. Y. 377); People v. Bisecker (169 N. Y. 53), and People v. Guiton (210 N. Y. 1), generally known as the oleomargarine or butter cases, which hold that legislation absolutely preventing the sale of a substitute inferior commodity, even though wholesome, is unconstitutional.

In the Kibler case (id.), water was used in milk and was clearly an adulterant, and the statute is sustained as for the preservation of health as well as the prevention of fraud.   The

addition of water seriously interferes with the normal standards of solids and fats in milk, and serves no other purpose than an opportunity to the offender to deceive and steal.

In the Arensburg case (id.), coloring was used in oleomargarine to simulate dairy butter, and in the Girard case (id.), coloring was used to give to a light colored inferior vinegar the appearance of cider vinegar. In both instances there is deliberate intent to deceive — there is not alone no food value, but the use of the coloring is clearly an adulterant serving no legitimate or useful purpose whatever, and is employed undoubtedly with a dishonest purpose, and can be justified on no other ground. In the Girard case, the court, referring to this subject, p. 108, says: " It masks the truth; it effects a disguise; it naturally deceives and is intended to deceive, and enables the substituted product to be foisted upon those who prefer and seek the old."

In my judgment the case at bar does not come within this last mentioned class of cases.

In People v. Marx (99 N. Y. 377), a statute absolutely forbid the manufacture and sale of oleomargarine or any other substitute for butter — regardless of whether wholesome or not — and was held void. The court said, p. 384: " The prohibition is not of the manufacture or sale of an article designed as an imitation of dairy butter or cheese, or intended to be passed off as such, but of an article designed to take the place of dairy butter or cheese." This is largely true of saccharin in its relation to sugar. In fact, it is claimed for it by the experts that it has an independent virtue, and that sugar and saccharin blended in proper proportions is far better than the use of sugar separately in that it arrests or prevents fermentation, and tends to preserve the main commodity while it prevents any nauseous taste that might result from the use of saccharin solely. In the case at bar, both were used. It is to be borne in mind, too, that just as in the oleomargarine cases it was not a question as to

whether dairy butter is better than oleomargarine. In the case at bar, it is not a question as to whether the use of sugar is better than the use of saccharin.

In People v. Bisecker (169 N. Y. 53), a statute absolutely forbidding the use of any than certain preservatives, regardless of whether deleterious to health or not, was held void. The court said, referring to the authorities generally on this subject, p. 57: " From these cases the following propositions may be deduced: 1. That the Legislature cannot forbid or wholly prevent the sale of a wholesome article of food. 2. That legislation intended and reasonably adapted to prevent an article being manufactured in imitation or semblance of a well-known article in common use, and thus imposing upon consumers or purchasers, is valid. 3. That in the interest of public health, the Legislature may declare articles of food not complying with a specified standard unwholesome and forbid their sale."

To meet the theory of law stated in this class of cases, the prosecution contends that saccharin is not a food, while oleomargarine, like butter, has a positive food value. All the experts for the defense agreed that saccharin is a new condiment and as such is more serviceable as a food accessory than pepper or spices. The experts for the prosecution, while unwilling to name it a condiment, conceded that it had sweetening quality vastly greater than sugar, so that without any desire to appear flippant one may say whether called a condiment or " by any other name it is just as sweet." In the first rule laid down in the Bisecker case, the reference to food would in my judgment include undoutedly a valuable food accessory. The third rule does not apply in this case, it being conceded that in usable commercial quantities in food saccharin is not deleterious to health. The second rule does not apply to prohibit saccharin for the reason that it is not an imitation of sugar in any sense. In bulk and properties it is different, its similarity relating solely to sweetness. Certainly sugar is not the only sweetening

commodity and, it may be said in this connection, the energy of saccharin for sweetening purposes is much greater than sugar. Where the resemblance is one in common with another product, it does not make it an imitation.

In People v. Guiton (210 N. Y. 1.), the court, commenting upon a similarity of color between butter and a substitute, said it "was a resemblance in inherent qualities common to both butter and oleomargarine, and was not the result of any artificial means or selection employed in the manufacture of said oleo-margarine," and therefore was not in violation of a valid statute forbidding imitation. Saccharin is a discovery prepared, it seems, solely because of its great sweetening value. The regulation is sought to be sustained solely because people may be deceived under some circumstances in believing they are consuming sugar. Then, why wouldn't a suitable label (a label was used in the case at bar) solve the situation, at least so far as it is capable of constitutional solution? The prevailing opinion states that this would be no protection to the blind and the illiterate. Can it be said, because of the danger of the blind and the illiterate being imposed upon, that it is lawful to forbid generally the use of an article of commerce or merchandise? If this be true, the doctrine relating to the limitation of lawful regulation to labeling must fall. In the Bisecker case (id.), the court said, p. 58: "Doubtless the Legislature could provide that where butter contains any perservative, except salt or sugar, the package should be clearly marked with a label stating such fact, and it might require any notice adapted to informing the public of the nature and treatment of the article offered for sale. This it has not done, but it has absolutely forbidden the sale." May it not be said with equal force, as in the case at bar, that this would not afford protection to the blind and the illiterate?

I am of the opinion that absolutely forbidding the use of saccharin in all food products is unreasonable and that the

regulation is therefore void. Fraud in its use is possible and may be probable, but this may be and should be controlled by reasonable regulation by requiring some such method as indicated in the Bisecker case.

If the view stated by me in this opinion was that of a majority of the court, I would not be in favor of dismissing the information, believing it to be the better practice for a trial court of inferior criminal jurisdiction in a case like the one at bar to find the defendant guilty and arrest judgment, thus preserving a right to review on the part of the prosecution. Under the circumstances, however, I must respectfully dissent from the conclusion reached by my associates and vote to dismiss the information on the ground that the facts therein stated do not constitute a crime for the reason that the regulation or ordinance is unreasonable and therefore void.